DES MOINES JOINT STOCK LAND BANK, Appellant, v. DAVID T. NORDHOLM et al., Appellees.

No. 42076.

APRIL 4, 1934.

Allen Whitfield and Edgar Musgrave, for appellant.

Frank Hollingsworth, for appellees.

Davis, McLaughlin & Hise, Thomas & Loth, C. J. Lynch and Donnelly, Lynch, Anderson & Lynch, and Vernon A. Vrooman, amici curiæ.

KINDIG, J.—On January 12, 1925, the defendants-appellees, David T. Nordholm and Elsie Marie Nordholm, husband and wife, executed a note for $12,000 to the plaintiff-appellant, Des Moines Joint Stock Land Bank of Des Moines, a corporation. The note was payable according to an amortized plan of $390 on the first days of February and August of each year, until sixty-eight semiannual payments were made. Then a final payment of $388.92 was to be payable on August 1, 1959. Interest at the rate of 5½ per cent per annum, payable semiannually, was to be paid on all deferred payments. In order to secure the note the appellees executed to the appellant a mortgage on certain land in Boone county, Iowa. Although the record is indefinite on the subject, yet it appears that some, if not all, of the installment payments were met by the appellees before August 1, 1931. It definitely appears in the record that the appellees failed to pay the amortized installment of $390 due on August 1, 1931. After the appellees' default in that payment, the appellant, in accordance with the terms of the note and mortgage, declared the entire unpaid portion of the indebtedness due and payable.

Accordingly, on September 8, 1931, the appellant commenced a suit in equity in the district court of Iowa, in and for Boone county, to recover judgment on the note and obtain the foreclosure of the mortgage securing the same. So, on March 25, 1932, the foreclosure suit resulted in a judgment of $12,041.49 in the appellant's favor against the appellees. As a part of that judgment, the mortgage was foreclosed on the Boone county real estate. An execution issued

on the judgment, and on May 6, 1932, the sheriff of Boone county offered the real estate for sale. At the sale, the appellant bid $11,000 for the property and the sheriff sold the same to it for that amount. Therefore a deficiency judgment remained. To evidence the appellant's purchase of the real estate at that execution sale, the sheriff, on May 6, 1932, issued to it a sheriff's certificate of sale. Under section 11774 of the 1931 Code, then applicable, the appellees had one year in which to redeem the Boone county land from the execution sale. That section reads:

"The debtor may redeem real property at any time within one year from the day of sale, and will, in the meantime, be entitled to the possession thereof; and for the first six months thereafter such right of redemption is exclusive."

When that statute, therefore, is applied to the facts in the case at bar, the appellees could have redeemed the land from the execution sale at any time within one year from May 6, 1932. If the appellees did not redeem within that period, however, their right of redemption would have terminated and the appellant would have been entitled to a sheriff's deed for the land.

While the year of redemption was passing but before it had passed, the legislature of Iowa, on March 18, 1933, enacted chapter 179 of the Acts of the Regular Session of the Forty-fifth General Assembly. This chapter of the Session Laws is popularly known as a moratorium extending the period of redemption. So far as material, the act provides:

"Section 1. In any action, for a real estate foreclosure of a mortgage or a deed of trust, which has been commenced in any of the courts, and in which a decree has been or may hereafter be entered, but the redemption period, as now provided, has not expired, upon application of the owner or owners of such real estate, the court shall, unless upon hearing upon said application good cause is shown to the contrary, order that no sheriff's deed shall be issued until March 1, 1935, and in the meantime the such owner or owners may redeem such property, and are entitled to possession thereof.

"Provided, the court having jurisdiction of such foreclosure action shall order and direct, that there shall be applied from the income of said real estate so much thereof as is just and equitable, toward the payment of taxes accruing thereon during the period

of redemption extension as provided by this act, and any balance distributed as the court may direct, and shall make such provision for the preservation of said property as will be just and equitable during the redemption period, and to this end the court may, in his discretion, in order to carry out the foregoing powers, appoint a receiver of said real estate, and invest said receiver with such powers as the court may find will be just and equitable to all parties to the proceeding.

"Providing, that in the event the said owner or owners do not comply with the orders of the court, the order for extension of redemption period as authorized by this act shall, on proper hearing, be set aside by order of the court.

"Sec. 2. During the period of extension of redemption, as herein provided, the owner or owners of said real estate shall have the exclusive right to redeem, and the rights of redemption of subsequent mortgagees, junior lienholders, and creditors shall terminate within the period as by law now provided, the provisions of this act notwithstanding.

"Sec. 3. During the period of extension of redemption, as herein provided, the clerk of the district court of the county in which such foreclosure action is brought, shall receive and disburse the income from said real estate, as the court shall order as just and equitable.

"Sec. 4. Any provisions of any law or laws now in force, which are in conflict with the provisions of this act, are hereby suspended until March 1, 1935.

"Sec. 5. From and after March 1, 1935, this act shall cease to be in force.

"Sec. 6. If any court of competent jurisdiction finds that any word, phrase, clause, sentence, or part of this act is unlawful it shall not invalidate any other part of this act."

The act carried a publication clause and went into effect immediately.

On April 8, 1933, David T. Nordholm, one of the appellees, filed an application in the district court of Boone county for an extension of the period of redemption on the said real estate until March 1, 1935. In that application, the said appellee agreed to submit to any order of court made "in reference to the income of said real estate during the redemption period as provided by law." A notice of that application for the extension was duly served upon the ap-

pellant, and in response to that notice the appellant appeared and filed a resistance to the application for an extension of the time of redemption.

Three objections to the extension are named in the appellant's resistance to the application and referred to in its argument on this appeal. These objections are: First, that chapter 179, Acts of the Regular Session of the Forty-fifth General Assembly, "is unconstitutional because it impairs the obligation of the mortgage contract originally given to appellant, contrary to section 10, article I of the Constitution of the United States, and article I, section 21 of the Constitution of the State of Iowa"; second, that said chapter 179 "is unconstitutional because it deprives appellant of vested property rights without due process of law as required by the Fourteenth Amendment to the Constitution of the United States and article I, section 9, of the Constitution of the State of Iowa"; and, third, that such chapter "cannot be sustained as constitutional on the theory that it is a valid exercise of the police power of the state of Iowa."

The application for the extension, and the resistance thereto, were submitted to the district court on April 21, 1933, and on that date the district court continued the period of redemption until March 1, 1935. As a part of the judgment extending the period of redemption, the district court also provided: First, "that the appellees shall remain in possession of the premises" during the extended period of redemption. Second, but that as a safeguard to that provision of the judgment, the district court declared that the "possession of the defendants * *. * shall be conditioned upon the faithful compliance with" chapter 179 enacted by the Forty-fifth General Assembly, "and with the orders of this court (district court) and with the terms of the written leases to be hereinafter executed. Said leases when executed shall provide for a reasonable rental of the premises described in the foreclosure action, which rental shall be one-half of all corn and two-fifths of all small grain raised on said premises, to be delivered to market free of charge, and $4.00 per acre per year for all pasture and hay land, payable at such times and in such installments as said written leases shall more particularly provide. Said leases may be made upon such other terms, and to contain such other and further provisions as are usual and customary in the community in which said farm is located. Said lease shall be made from year to year, beginning March 1, 1933, and terminating March 1, 1935, and shall be upon the rental terms

herein provided unless otherwise ordered by the (district) court, and the statutes governing landlord's liens, and enforcement thereof shall in all respects be applicable to such leasehold. That the cash rental provided in said lease shall be paid to the Clerk of the (district) court when the same or a part thereof matures and the proceeds from the sale of the crops raised on said real estate shall be paid to the clerk of (the district) court when the sale thereof is ordered by an agent of (the district) court. Said cash rental and the proceeds of corn and small grain sold shall be distributed by the clerk of (the district) court in the following order:

(a) In the payment of taxes beginning with delinquent taxes, if any;

(b) In the payment of insurance;

(c) In the payment of reasonable and necessary costs of maintenance and upkeep;

(d) Balance, if any, to be paid to the owner of the sheriff's certificate (the appellant)"; and, third, "that Homer Busby, of Boone," is appointed a receiver "to act as the agent of (the district) court for the enforcement of (the) order and of the statute aforesaid." "As such it shall be his duty to negotiate, execute, and report to (the district) court written leases for the use and occupancy of said premises during the period of this continuance, and extension, giving the said defendant David T. Nordholm (appellee) the first right to rent the same under the terms above prescribed. It shall further be his duty to see that said lease is in all respects faithfully observed, that the rents are promptly and faithfully paid to the clerk, as above provided, and that such rents are applied as herein specified. It shall be his duty from time to time to report his doings to the (district) court, to apply from time to time for the orders and directions of (the district) court, and especially to report all violations hereof or dereliction in the complying with the provisions hereof. He shall at all times be the representative, servant, and agent of (the district) court, and as such shall at all times keep the (district) court well informed respecting said premises and the carrying out of the proposed lease and the provisions of this order, and may make his reports and procure orders and directions thereon in term time or in vacation."

From the judgment thus entered the plaintiff appeals.

I. This court is confronted first with the appellant's argument that chapter 179, Acts of the Regular Session of the Forty-fifth Gen-

eral Assembly of Iowa, above quoted, is unconstitutional when applied to the mortgage contract under consideration, because the same is in conflict with section 10, article I, of the Constitution of the United States. That provision of the Federal Constitution is:

"No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, *or Law impairing the Obligation of Contracts*, or grant any Title of Nobility." (Italics supplied.)

It then is incumbent upon this court to determine whether the Iowa moratorium providing for the extension of the time of redemption under mortgage execution sales is, as applied to the facts in the case at bar, in conflict with the above-quoted provision of the United States Constitution. When not speaking of the reserved power of the state to cope with an emergency arising out of a great financial crisis following a war, the Supreme Court of the United States, in Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 1045, 41 L. Ed. 93, said, concerning a Kansas statute extending the period of redemption after a mortgage foreclosure:

" 'At all events, the decisions of this court are numerous that the laws which prescribe the mode of enforcing a contract, which are in existence when it is made, are so far a part of the contract that no changes in these laws which seriously interfere with that enforcement are valid, because they impair its obligation, within the meaning of the constitution of the United States.' * * * 'If such rights may be added to the original contract by subsequent legislation, it would be difficult to say at what point they must stop. An equitable estate in the premises may, in like manner, be conferred upon others; and the right to redeem may be so prolonged as to deprive the mortgagee of the benefit of his security, by rendering the property unsalable for anything like its value. * * * Any such modification of a contract by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obligations, and is prohibited by the constitution.' * * * We hold that a statute which authorizes the redemption of property *sold upon foreclosure of a mortgage, where no right of redemp*tion previously existed, or which *extends* the period of redemption

beyond the time formerly allowed, cannot constitutionally apply to a sale under a mortgage executed before its passage." (Italics supplied.) Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143; McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397; Gantly's Lessee v. Ewing, 3 How. 707, 11 L. Ed. 794; Howard v. Bugbee, 24 How. 461, 16 L. Ed. 753; Gunn v. Barry, 15 Wall. 610, 21 L. Ed. 212; Walker v. Whitehead, 16 Wall. 315, 21 L. Ed. 357; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Bradley v. Lightcap, 195 U. S. 1, 24 S. Ct. 748, 49 L. Ed. 65. Many other cases might be cited to the same effect, but the foregoing will indicate the holdings of the Supreme Court of the United States on the general subject.

Regardless of the declaration in the Constitution of the United States that the state shall pass no law impairing the obligation of contracts, there nevertheless is reserved to the states their police power and the power to sustain their sovereignty and government and their existence as states. Nebbia v. People of the State of New York, 54 S. Ct. 505, 78 L. Ed. 563, 89 A. L. R. 1469. Such police power "is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals." Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 255, 88 A. L. R. 1481; Nebbia v. People of the State of New York, supra. "The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." Home Building & Loan Assn. v. Blaisdell, supra. If the state legislation "is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end", all contracts are made subject to the legislation. Home Building & Loan Assn. v. Blaisdell (290 U. S. 398), supra.

So, while it is necessary for each state to obey the mandate in the Constitution of the United States against the enactment of legislation impairing the obligation of contract, yet the state does not impair the obligation of contract sought to be protected by that federal constitutional provision when it enacts legislation within its police power and within its reserved power to protect its sovereignty, its government, its people, and their welfare against exigencies that may arise in a great emergency. Nebbia v. People of the

State of New York (54 S. Ct. 505), supra; Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus Brown Holding Co., Inc., v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Edgar A. Levy Leasing Co., Inc., v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595. While ordinarily the extension of the period of redemption would amount to an impairment of the obligation of the mortgage contract, in contravention of the federal constitutional provision, yet, within the limits above suggested, there may be an extension of such period of redemption without encroaching upon the federal constitutional prohibition. This thought is demonstrated in the opinion of the Supreme Court of the United States, recently adopted in the Minnesota mortgage cases. Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra. The Minnesota legislature, on April 18, 1933, approved the so-called Minnesota mortgage moratorium law. Under that law, the mortgagor, under stated conditions, could obtain an extension of the time of redemption after the foreclosure of the mortgage and the execution sale thereunder. John H. Blaisdell and Rosella Blaisdell, debtors, made application, under the Minnesota Moratorium law, for such extension. It was denied them by the trial court on the theory that the Minnesota moratorium act was unconstitutional. They appealed to the Supreme Court of Minnesota. That court allowed the extension (249 N. W. 334, 86 A. L. R. 1507) and overruled the judgment of the trial court. When so doing, the Supreme Court of Minnesota sustained the constitutionality of the Minnesota law. An appeal was taken from the Supreme Court of Minnesota to the Supreme Court of the United States. In that case the Supreme Court of the United States, speaking through Mr. Chief Justice Hughes, stated the facts as follows:

"Appellant (the Home Building and Loan Association) contests the validity of chapter 339 of the Laws of Minnesota of 1933, p. 514, approved April 18, 1933, called the Minnesota Mortgage Moratorium Law, as being repugnant to the contract clause (Article I, sec. 10) and the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution. The statute was sustained by the Supreme Court of Minnesota (249 N. W. 893), and the case comes here on appeal.

"The act provides that, during the emergency declared to exist,

relief may be had through authorized judicial proceedings with respect to foreclosures of mortgages, and execution sales, of real estate; that sales may be postponed and *periods of redemption may be extended.* (Italics supplied.) * * * The act declares that the various provisions for relief are severable; that each is to stand on its own footing with respect to validity. * * * We are here concerned with the provisions of Part One, Section 4, authorizing the district court of the county to extend the period of redemption from foreclosure sales 'for such additional time as the court may deem just and equitable.' * * * The extension is to be made upon application to the court, on notice, for an order determining the reasonable value of the income on the property involved in the sale, or, if it has no income, then the reasonable rental value of the property, and directing the mortgagor 'to pay all or a reasonable part of such income or rental value, in or toward the payment of taxes, insurance, interest, mortgage * * * indebtedness at such times and in such manner' as shall be determined by the court. The section also provides that the time for redemption from foreclosure sales theretofore made, which otherwise would expire less than thirty days after the approval of the act, shall be extended to a date thirty days after its approval, and application may be made to the court within that time for a further extension as provided in the section. By another provision of the act, no action, prior to May 1, 1935, may be maintained for a deficiency judgment until the period of redemption as allowed by existing law or as extended under the provisions of the act has expired. Prior to the expiration of the extended period of redemption, the court may revise or alter the terms of the extension as changed circumstances may require. * * *

"Invoking the relevant provision of the statute, appellees applied to the district court of Hennepin county for an order extending the period of redemption from a foreclosure sale. Their petition stated that they owned a lot in Minneapolis which they had mortgaged to appellant; that the mortgage contained a valid power of sale by advertisement, and that by reason of their default the mortgage had been foreclosed and sold to appellant on May 2, 1932, for $3,700.98; that appellant was the holder of the sheriff's certificate of sale; that, because of the economic depression, appellees had been unable to obtain a new loan or to redeem, and that, unless the period of redemption were extended, the property would be irretrievably lost; and that the reasonable value of the property greatly exceeded

the amount due on the mortgage, including all liens, costs, and expenses."

After stating the nature of the action in the manner and way above indicated, the Supreme Court of the United States, following a thorough and exhaustive discussion of the constitutional aspect of the Minnesota moratorium law, concluded as follows:

"1. An emergency existed in Minnesota which furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community. The declarations of the existence of this emergency by the Legislature and by the Supreme Court of Minnesota cannot be regarded as a subterfuge or as lacking in adequate basis. * * * The finding of the Legislature and state court has support in the facts of which we take judicial notice. * * * It is futile to attempt to make a comparative estimate of the seriousness of the emergency shown in the leasing cases from New York and of the emergency disclosed here. The particular facts differ, but that there were in Minnesota conditions urgently demanding relief, if power existed to give it, is beyond cavil. As the Supreme Court of Minnesota said (249 N. W. 334, 337 [86 A. L. R. 1507]), the economic emergency which threatened 'the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence' was a 'potent cause' for the enactment of the statute.

"2. The legislation was addressed to a legitimate end; that is, the legislation was not for the mere advantage of particular individuals but for the protection of a basic interest of society.

"3. In view of the nature of the contracts in question—mortgages of unquestionable validity—the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency, and could be granted only upon reasonable conditions.

"4. The conditions upon which the period of redemption is extended do not appear to be unreasonable. The initial extension of the time of redemption for thirty days from the approval of the act was obviously to give a reasonable opportunity for the authorized application to the court. As already noted, the integrity of the mortgage indebtedness is not impaired; interest continues to run; the validity of the sale and the right of a mortgagee-purchaser to title or to obtain a deficiency judgment, if the mortgagor fails to redeem

within the extended period, are maintained; and the conditions of redemption, if redemption there be, stand as they were under the prior law. The mortgagor during the extended period is not ousted from possession, but he must pay the rental value of the premises as ascertained in judicial proceedings and this amount is applied to the carrying of the property and to interest upon the indebtedness. The mortgagee-purchaser during the time that he cannot obtain possession thus is not left without compensation for the withholding of possession. Also important is the fact that mortgagees, as is shown by official reports of which we may take notice, are predominantly corporations, such as insurance companies, banks, and investment and mortgage companies. These, and such individual mortgagees as are small investors, are not seeking homes or the opportunity to engage in farming. Their chief concern is the reasonable protection of their investment security. It does not matter that there are, or may be, individual cases of another aspect. The Legislature was entitled to deal with the general or typical situation. The relief afforded by the statute has regard to the interest of mortgagees as well as to the interest of mortgagors. The legislation seeks to prevent the impending ruin of both by a considerate measure of relief. * * *

"Although the courts would have no authority to alter a statutory period of redemption, the legislation in question permits the courts to extend that period, within limits and upon equitable terms, thus providing a procedure and relief which are cognate to the historic exercise of the equitable jurisdiction. If it be determined, as it must be, that the contract clause is not an absolute and utterly unqualified restriction of the state's protective power, this legislation is clearly so reasonable as to be within the legislative competency.

"5. The legislation is temporary in operation. It is limited to the exigency which called it forth. While the postponement of the period of redemption from the foreclosure sale is to May 1, 1935, that period may be reduced by the order of the court under the statute, in case of a change in circumstances, and the operation of the statute itself could not validly outlast the emergency or be so extended as virtually to destroy the contracts.

"We are of the opinion that the Minnesota statute as here applied does not violate the contract clause of the Federal Constitution. Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."

So far as material, the Minnesota mortgage moratorium law considered in the Home Building & Loan Association case (290 U. S. 398), supra, by the Supreme Court of the United States, is not materially different from chapter 179, Acts of the Forty-fifth General Assembly of Iowa, regular session. Both statutes were enacted for emergency purposes. Each statute provides for a limitation of the moratorium. Also each statute provides for compensation for the mortgagee during the period of redemption. It is said, however, that the Iowa statute does not provide for reasonable compensation to the mortgagee. When the Iowa act is fairly read and due significance given to all of its provisions, it appears beyond peradventure of doubt that the act contemplates and provides for at least a reasonable rental of the mortgaged premises during the year of redemption. The act then authorizes the payment of taxes during the period concerned. Then there is a provision for using a part of the compensation for the preservation of the property. Also it is provided in the act that the balance of the rent shall be distributed "as the court may direct." According to Webster's New International Dictionary, the word "distribute" means: "To divide among several or many." A synonym for the word "distribute" is the word "divide". Webster's New International Dictionary.

To whom is the rent to be distributed under the act? So far as the act contemplates, there are only two persons, generally speaking, interested in such rentals. These persons are: First, the mortgagee; and, second, the mortgagor. This rent, under the act, is to be equitably distributed. There could be no equitable distribution under the act unless the rentals were given to the mortgagee to the extent that the same would reasonably compensate it for its property involved. Any other distribution of the rentals would not be equitable. It is only an equitable distribution of the rentals that is contemplated by the act. Consequently it is presupposed by the act, and, in fact, enjoined upon the district court, that it shall make such equitable distribution of the rents to the mortgagee as will compensate it under the circumstances. If the rentals, in any event, would amount to a sum that would more than compensate the mortgagee under the circumstances, then the balance equitably could be delivered to the mortgagor. Compensation, therefore, to the mortgagee is amply provided for by the Iowa Moratorium Act. Therefore, the legislature did not leave it to the courts to say whether it would be equitable to compensate the mortgagee.. This is true be-

cause the act itself contemplates and provides, in effect, that equity demands such compensation.

The crisis which brought forth the Minnesota moratorium statute is similar to the crisis which brought forth the Iowa moratorium statute. Minnesota and Iowa are geographically located side by side. Speaking generally, the economic conditions that affect the citizens of one state likewise affect the citizens of the other. Near the time when the Iowa legislature enacted chapter 179, Laws of the Forty-fifth General Assembly, it also enacted chapter 182 of the same laws. That law provides for the continuance of foreclosure cases then pending in the various trial courts of the state. In section 1 of chapter 182 of those laws, the legislature declared:

"The governor of the state of Iowa having declared that an emergency now exists, and the general assembly having determined that such emergency does exist, which is general throughout the state, and that the safety and future welfare of the state as a whole is endangered thereby, the general assembly acting under the power reserved by the people of Iowa, does hereby enact the following:" etc.

Although we are not bound by that legislative finding, yet such finding is entitled to great consideration by us. Many other states of the Union also found that the emergency existed. Manifestly the emergency referred to in chapter 182 equally applied when chapter 179 was enacted. Most, if not all, banks, both state and national, and great insurance companies asked for and obtained from the legislature, moratoriums. The moratorium obtained by the insurance companies prevented policyholders from borrowing on their policies or receiving the cash surrender values under their contracts of insurance. Likewise depositors were prevented from withdrawing money from the banks under their contracts of deposit. Hundreds of mortgagors 'were threatened to be dispossessed and thrown out upon the highways of the state. These mortgagors, were it not for the moratorium, would have lost their lands and their homes. A material portion of the taxes could not be collected, and the very operations of the state government itself were threatened. Every emergency which existed in Minnesota existed in Iowa at the time in question, and the basis for sustaining the Minnesota act likewise exists in Iowa for the sustaining of the act now under consideration. The Minnesota act provided for the extension of the time of redemp-

tion, as does the Iowa act. That provision of the Minnesota act was sustained by the Supreme Court of the United States, as shown by Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra. So far as material, there is no difference between the Minnesota act in that respect and the Iowa act relating to the same matter.

It was said by the Minnesota court, and likewise indicated by the Supreme Court of the United States, in the Home Building & Loan Association case (290 U. S. 398), supra, that the emergency which justified the calling forth of the state's power to enact the Moratorium Act still exists. Necessarily, if the emergency exists in Minnesota, it must likewise exist in Iowa because the general financial conditions of the two states are very similar. Aside from that, it is obvious that the emergency condition does still exist in Iowa. While some of the banks have been opened, yet many of them still are closed. Generally speaking, the emergency which called forth the moratorium has not passed.

Wherefore, it is apparent that the Iowa Moratorium Act under consideration is not unconstitutional because in conflict with section 10, article I, of the Constitution of the United States. Consequently it was proper for the district court of Boone county to extend the time of redemption to March 1, 1935, but that judgment must be modified to the extent that if the emergency passes before that time, then the appellant shall have the right to have the order for the extension changed. See Home Building & Loan Association v. Blaisdell (290 U. S. 398, 54 S. Ct. 231), supra. As said in the Home Building & Loan Association case:

"The Court (in the rent cases) also decided that, while the declaration by the Legislature as to the existence of the emergency was entitled to great respect, it was not conclusive; and, further, that a law 'depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed.' It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends." See same case.

II. Next it is argued by the appellant that the statute in question, when applied to the issues in this case, is unconstitutional because it is in conflict with section 21 of article I of the Constitution of Iowa. That section of the Iowa constitution provides:

"No bill of attainder, ex post facto law, or law impairing the obligation of contracts, shall ever be passed."

The suggestion has been made that the above-quoted section of the Iowa constitution must be considered with section 1 of article XII of the same Constitution. According to that section:

"This Constitution shall be the supreme law of the State, and any law inconsistent therewith, shall be void."

Although section 1 of article XII is not pleaded by the appellant as a reason for the unconstitutionality of the legislative act in question, yet no doubt that section may be considered with section 21 of article I, when determining the scope of the last-named section of the Iowa constitution. Our task, then, is to determine whether the Iowa law in question is in conflict with section 21 of article I of the Iowa constitution, because it provides for the extension of the time of redemption after execution sale under a mortgage foreclosure.

Speaking generally upon the subject, this court said in Malony v. Fortune et ux., 14 Iowa 417, reading on page 420:

"When the contract sued on was made, no such right of redemption existed. Section 10 of the Federal Constitution prohibits the passage of any laws by any of the States impairing the obligation of contracts. Article I, section 21, of our State Constitution has a like prohibition against such legislation. The passage of relief laws (during the Civil War)—designed to be retroactive in their operation —in so many of the States, has engaged the attention of not only the State, but also of the Federal Courts, in relation to their constitutionality. The argument against the validity of such laws, repeated in so many decisions, is familiar to the legal mind. It is useless, at this time, to undertake to refer in detail to the reported cases in which this question has been so thoroughly discussed. * * * We only add that in our opinion this act of the Legislature in so far as it affects contracts made prior to its passage is invalid."

That case did not consider the reserved or police power of the state. Likewise that case was decided before the Supreme Court of the United States handed down its opinions in Home Building & Loan Association v. Blaisdell (290 U. S. 398, 54 S. Ct. 231), supra; Block v. Hirsh (256 U. S. 135, 41 S. Ct. 458), supra; Marcus Brown

Holding Co., Inc., v. Feldman (256 U. S. 170, 41 S. Ct. 465), supra; Edgar A. Levy Leasing Co., Inc., v. Siegel (258 U. S. 242, 42 S. Ct. 289), supra. An historical research will reveal that the prohibition against the impairment of the obligation of contracts, found in the Iowa Constitution, originated in section 10, article I, of the Constitution of the United States. See dissenting opinion in Home Building & Loan Association v. Blaisdell (290 U. S. 398, 54 S. Ct. 231), supra. Obviously the prohibition was embodied in the Constitution of Iowa in obedience to, and in conformity with, a similar provision in the Constitution of the United States. In view of the historical relationship of these clauses in the Constitution of the United States and in the Constitution of Iowa, it is apparent that there should be a similarity in construction. The purpose and intent of the contract clause in the Constitution of the United States should be carried out by this court in interpreting the similar provision in the Constitution of Iowa. There is no doubt that this court has the power, in interpreting the Constitution of Iowa, to reach a conclusion on the contract clause different from that reached by the Supreme Court of the United States when interpreting a similar clause of the Federal Constitution; that is to say, so long as the Iowa Constitution, as interpreted by this court, does not violate any provision of the Federal Constitution, there will be no complaint from the federal government.

But assuming that to be true, good policy and a desired consistency between the two Constitutions rather dictate that the interpretation of the two clauses be similar. Such consistency in interpretation will accomplish consistency in operation. Uniformity in the construction of these contract clauses is most desirable, if not absolutely necessary. So when Malony v. Fortune (14 Iowa 417), supra, is read in connection with Barnitz v. Beverly (163 U. S. 118), supra, and other cases of that kind, it is apparent that those cases apply generally, but do not have application when the principles announced in the following cases apply: Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra; Block v. Hirsh (256 U. S. 135), supra; Marcus Brown Holding Co., Inc., v. Feldman (256 U. S. 170), supra; Edgar A. Levy Leasing Co., Inc., v. Siegel (258 U. S. 242), supra.

Under the reserved power of this state, it may exercise that power which is generally known as the police power. Contracts are made and enforced subject to the police power of the state. "Socie-

ties exercise a positive control as well over the inception, construction and fulfillment of contracts, as over the form and measure of the remedy to enforce them." Ogden v. Saunders, 12 Wheat. 213, 286, 354, and 355, quoted in Home Building & Loan Association v. Blaisdell, supra. It was said in Home Building & Loan Association v. Blaisdell, supra:

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. * * * While emergency does not create power, emergency may furnish the occasion for the exercise of power."

What power, then, is reserved under the contract clause of the state Constitution?

The Ninth Amendment to the Constitution of the United States provides:

"The enumeration in the Constitution, of. certain rights, shall not be construed to deny or disparage others retained by the people."

And Amendment 10 to the Constitution of the United States continues with the following reservation: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Section 25, article I, of the state Constitution declares: "This enumeration of rights shall not be construed to impair or deny others, retained by the people."

Such reserved power has relation to particular conditions. Therefore, the power cannot be exercised except in response to the proper conditions. Of course, under this provision of the state Constitution, contracts cannot be destroyed nor can the remedy to enforce them be taken away. On the other hand, the appellant in the case at bar could not enjoy and enforce its contract if it were not for the existence of the government which furnishes the remedy for the enforcement. If that government is destroyed, it cannot afford a remedy to enforce the obligation of a contract. Such state government is necessary to sustain the state Constitution. Without such government, the state Constitution would be ineffective indeed. Plainly, therefore, the contract clause of the state Constitution as well as that of the Federal Constitution presupposes that the state,

regardless of the clause, may maintain and sustain itself. What is here said in reference to the contract clause of the Iowa Constitution likewise applies to section 1, article XII, of that Constitution. Obviously the Constitution would not be the supreme law of the land, as provided in section 1 of article XII, if there is no government to sustain the Constitution as such supreme law. Nebbia v. People of the State of New York (54 S. Ct. 505), supra. During its discussion in the Nebbia case, supra, the Supreme Court of the United States said:

"But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. * * * " Again the Supreme Court of the United States, in the Nebbia case, supra, stated:

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, *as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government*, as shown by the quotations above given (in the Nebbia opinion)." (Italics supplied.)

Among the reserved powers of the state under the contract clause must be such as are "vested in it for the promotion of the common weal" and included in such reserved powers is the sovereign right "to protect the lives, health, morals, comfort, and general welfare of the people." Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra; Block v. Hirsh (256 U. S. 135), supra; Marcus Brown Holding Co., Inc., v. Feldman (256 U. S. 170), supra; Edgar A. Levy Leasing Co., Inc., v. Siegel (258 U. S. 242), supra. Contracts are necessarily made and enforced subject to such reserved power of the state.

The Supreme Court of the United States, in Lawton v. Steele, 152 U. S. 133, said concerning this power:

"Under this power it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path

of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. *Beyond this, however,* the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests." (Italics supplied.) To the same effect, see Loftus v. Department of Agriculture, 211 Iowa 566, 232 N. W. 412.

In Manigault v. Springs, 199 U. S. 473, 50 L. Ed. 274, the Supreme Court of the United States said:

"It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the *common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.* This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals. Familiar instances of this are where parties enter into contracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery, all of which are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, *that parties, by entering into contracts, may not estop the legislature from enacting laws intended for the public good.* While this power is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary,—*a discretion which courts ordinarily will not interfere with.*" (Italics supplied.)

Our own Supreme Court has made similar declarations with reference to the broad scope of this reserved power. During our discussion in McGuire v. Chicago, B. & Q. R. Co., 131 Iowa 340, 108 N. W. 902, we suggested:

"The police power, as that term is commonly employed, may be paraphrased as society's natural right of self-defense, and its definition and limitation vary with the circumstance calling for its exercise. To embalm it in any fixed or rigid formula would be to destroy its value, for it would then be deprived of its indispensable quality of adaptation to changing conditions, and thus defeat the ends it was intended to promote. * * * While protection of public health and public morals and the promotion of social order are peculiarly within its province, these are but instances of its application, and do not limit its sphere of action. * * * The police power of the state is the power to govern men and things within the limit of its dominions. It comprehends all those general laws of internal regulations necessary to secure peace, good order, health, and prosperity of the people, and the regulations and protection of property and property rights."

Another excerpt from an opinion of this court may be chosen which is more applicable to the question here involved. We said in Ætna Insurance Company v. Chicago Great Western Railway Company, 190 Iowa 487, reading on pages 491, 492, 180 N. W. 649, 651:

"It is fundamental that a state *can by no act deprive itself* of the right or authority to enact legislation within the proper scope of its police power, although the effect of a particular enactment be to impair the obligation of private contracts and prevent the enforcement of the terms thereof." (Italics supplied.)

What this court said in the excerpt just quoted from the Ætna Insurance Company case related to the contract clause of the United States Constitution. To the same effect, see McCormick v. Rusch, 15 Iowa 127, and Butler, Keith & Co. v. McCall & Sypher, 15 Iowa 430. But that does not make the theory there announced inapplicable when applied to such clause in the state Constitution.

So then, if as before said, the state legislation "is addressed to a legitimate end" in behalf of the common welfare "and the measures taken are reasonable and appropriate to that end," all contracts, as before indicated, are made subject to the legislation.

This result can be reached even in the face of the contract clause in our state Constitution. That result was reached by the Supreme Court of the United States in the face of the contract clause of the Federal Constitution. Moreover, the Supreme Court of the United States has held that a state Constitution does not prohibit the state from exercising its police power. Manigault v. Springs (199 U. S. 473, 26 S. Ct. 127), supra. In that case the following facts were involved:

"It was also charged that the Constitution of South Carolina, declared that all navigable waters should forever remain public highways, was a privilege annexed to and constituting a part of the value of the lands, and that the damming of the creek, except for the purpose of the public health, welfare, and safety, and without due compensation therefor, was a destruction of the property of the plaintiff, and a deprivation thereof without due process of law. * * * We do not think the provision of the Constitution of South Carolina interferes with these common-law powers of the state over its navigable waters. * * * While all of these cases turned upon the power of the state to authorize the erection of bridges, the same principle applies where the legislature deems it necessary to the public welfare to make other improvements for the reclamation of swampy and overflowed lands, though certain individual proprietors may thereby be subjected to expense."

Such power of the state to legislate in behalf of the public welfare was not only reserved to the state when it became a member of the Federal Union, but also such power was reserved by the people of the state when they adopted their own state Constitution. For instance, section 25 of article 1 of the Iowa Constitution, as before indicated, provides that this enumeration of rights (those contained in the Iowa Bill of Rights) shall not be construed to impair or deny others retained by the people. The sovereignty of the state demands that the people who constitute the state reserve to themselves the power to sustain the state, as before indicated. Nebbia v. People of the State of New York (54 S. Ct. 505), supra. Unless the people, as organized into a state, can sustain and protect themselves as such, they cannot sustain and defend the state Constitution. Contracts are protected and enforced under the Constitution, but if the people who defend and support the Constitution cannot support it, of necessity, then, they cannot protect and enforce private contracts. So, the

power of the people to protect, maintain, and sustain their government necessarily carries with it the power to legislate for the common welfare in a great emergency. That is one of the purposes of the police power. Such police power is the power by which the people protect themselves and sustain and maintain their state government. A fundamental part of that police power is the right of the state to protect the general welfare. If the entire economic structure of the state should collapse, it would be difficult, if not impossible, for the people to sustain their government. Necessarily the people need not wait until the destruction of such economic system or the destruction of their government before they may proceed to protect themselves and their government. The police power which preserves the general welfare may be called forth to protect the state in a great economic emergency. Nebbia v. People of the State of New York (54 S. Ct. 505), supra; Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra; Block v. Hirsh (256 U. S. 135), supra; Marcus Brown Holding Co. v. Feldman (256 U. S. 170), supra; Edgar A. Levy Leasing Co. v. Siegel (258 U. S. 242), supra.

"The economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra. The only question is: First, whether the proper occasion exists for the exercise of such power; and, second, whether the legislation is appropriate enough in its terms and limitations to be within the scope of such power.

Therefore, as previously said, if the state legislation now under consideration "is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end," all contracts are made subject to the legislation. Barnitz v. Beverly (163 U. S. 118), supra; Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra; Block v. Hirsh (256 U. S. 135), supra; Marcus Brown Holding Co. v. Feldman (256 U. S. 170), supra; Edgar A. Levy Leasing Co. v. Siegel (258 U. S. 242), supra. See, also, People v. LaFetra, 230 N. Y. 429, 130 N. E. 601; Atlantic Coast Line Railroad Co. v. City of Goldsboro, 232 U. S. 548, 34 S. Ct. 364, (N. Car.) ; Manigault v. Springs et al. (199 U. S. 473, 26 S. Ct. 127), supra; Louisville & Nashville Railroad Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265; Union Dry Goods Co. v. Georgia Service Corporation, 248 U. S. 372, 39 S. Ct. 117. By analogy, at least, the Supreme

Court of the United States has held, in Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra, that an economic emergency existed sufficient to constitute the time this legislation was enacted an appropriate occasion for the adoption of such law. Likewise the Supreme Court of the United States in that case held that the Minnesota law was proper in its terms and limitations to be valid under such police or reserved power. At least by analogy, the Supreme Court of the United States, when sustaining that mortgage law, laid the foundation upon which to sustain the Iowa Moratorium Law now under consideration.

Previously we have detailed, in division I of this opinion, the facts constituting the emergency. A repetition of those facts at this place is not essential. It is sufficient here merely to refer to them. The Iowa moratorium law under consideration does not destroy the obligation of the appellant's contract; but rather such law recognizes, sustains, and protects the obligation of that contract. While the appellant cannot enforce his contract through the ordinary remedy for a temporary period, yet, even during that temporary period, the appellant does have a remedy which is suitable for the occasion. At the end of the emergency period the former remedy will be automatically returned to the appellant. In the meantime, the appellant, under the Iowa law, is fully compensated and protected. Manifestly, as thus limited, the Iowa moratorium law is not prohibited by the Iowa Constitution. As said in division I, the district court extended the period of redemption in the case at bar to March 1, 1935. This was proper, providing the emergency which called forth the law does not pass before that time. If the emergency does pass before the date fixed by the district court, then the redemption period shall terminate upon the application of the mortgagee. Home Building & Loan Association v. Blaisdell, supra. Subject to that modification, we feel that the judgment of the district court was correct. We have taken the position here announced solely because of, and in order to be in harmony with, the more recent decisions of the Supreme Court of the United States, above cited. All of the arguments made in opposition to this conclusion are fully answered by the Supreme Court of the United States in Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra.

III. Continuing its attack upon the Iowa Moratorium Law, the appellant argues that the redemption extension statute under consideration is unconstitutional because it denies it due process of

law, contrary to the Fourteenth Amendment to the Constitution of the United States and article I, section 9 of the Constitution of the State of Iowa.

That question was considered by the Supreme Court of the United States in Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra. When discussing this phase of the controversy, the Supreme Court of the United States said in that case:

"What has been said on that point (the contract clause of the Federal Constitution) is also applicable to the contention presented under the due process clause. * * * Nor do we think that the statute (The Minnesota redemption moratorium statute) denies to the appellant the equal protection of the laws. The classification which the statute makes cannot be said to be an arbitrary one." To the same effect, see Block v. Hirsh (256 U. S. 135), supra; Marcus Brown Holding Co. v. Feldman (256 U. S. 170), supra; Edgar A. Levy Leasing Co. v. Siegel (258 U. S. 242), supra; Nebbia v. People of the State of New York (54 S. Ct. 505), supra.

We feel, in view of the decision of the Supreme Court of the United States, that it is unnecessary to pursue this phase of the controversy any further. While it is not for us to say whether the Iowa legislation in question is wise or unwise, as a matter of policy, yet, because of the above considerations, we hold that the act is constitutional on the issues raised by the appellant in the case at bar. Accordingly, the judgment of the district court should be modified to the extent indicated, and otherwise affirmed.

Wherefore the judgment and decree of the district court is modified and affirmed.—Modified and affirmed.

Evans, Mitchell, Anderson, and Donegan, JJ., concur.

Claussen, C. J., and Stevens, Albert, and Kintzinger, JJ., dissent.

Mitchell, J. (concurring)—I concur in the majority opinion, but desire to express my views in regard to that part of the opinion that modifies the decree of the lower court.

Under the act passed by the legislature of the state of Iowa, the period of redemption is extended to March 1, 1935. The lower court found that an emergency existed, and rightly so, and, having found that an emergency existed, extended the period of redemption

as specified in the act. The opinion modifies that holding so that the question of whether there is an emergency existing can be taken up at any time by the lower court, and the period of redemption is not extended until March 1, 1935, as the act passed by the legislature provided.

Chief Justice Hughes, in the case of Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 241, 78 L. Ed. 255, 88 A. L. R. 1481, sets out the following:

"The cases of the Marcus Brown Company and the Levy Leasing Company arose under legislation of New York, and the constitutional provision against the impairment of the obligation of contracts was invoked. The statutes of New York, declaring that a public emergency existed, directly interfered with the enforcement of covenants for the surrender of the possession of premises on the expiration of leases. Within the city of New York and contiguous counties, the owners of dwellings, including apartment and tenement houses (but excepting buildings under construction in September, 1920, lodging houses for transients and the larger hotels), were wholly deprived until November 1, 1922, of all possessory remedies for the purpose of removing from their premises the tenants or occupants in possession when the laws took effect (save in certain specified instances) providing the tenants or occupants were ready, able, and willing to pay a reasonable rent or price for their use and occupation."

And so we find that the legislature of the state of New York in the "rent" cases extended the period of time for almost two years. That is, the legislature by the act definitely extended the period during which a landlord could not oust his tenant, until November 1, 1922. And the Supreme Court of the United States held that, due to the emergency, under the police power the statute passed by the state of New York, which fixed a definite time, was constitutional. And so, under the police power, the legislature of the state of Iowa had a right to pass the act under consideration in this case, due to the emergency which existed at the time the legislature passed the act—an emergency which affects the public health and the welfare of the people of the state of Iowa a great deal more, in my judgment, than did the emergency which existed in 1917 affect the people of the state of New York, when the legislature of that state passed the act which was upheld by the Supreme Court of the United States.

If the state of New York had a right to extend the period for a definite time in the "rent" cases, then certainly the legislature of the state of Iowa had a right to extend the period of redemption for a definite time; the only limitation being the extension must be a reasonable one. The statute before this court is limited in time; it extends the period of redemption only to March 1, 1935, a matter of but two short years at the time the legislature enacted the law, and now a period of less than a year. It is a temporary extension and a reasonable one. In view of the decision of the Supreme Court of the United States, the legislature of the state of Iowa had a right to extend the period of redemption until March 1, 1935.

I would affirm the decree and judgment of the lower court and not modify it as the majority do.

CLAUSSEN, C. J. (dissenting)—On January 12, 1925, appellees executed and delivered to appellant a note secured by mortgage on real property in Boone county, Iowa. Upon default in the performance of the terms of the mortgage, appellant commenced an action on September 8, 1931, in the Boone district court for its foreclosure. On the 25th day of March, 1932, a decree, containing no unusual terms, was entered foreclosing the mortgage. Special execution was issued, and on May 6, 1932, the mortgaged property was sold at sheriff's sale to appellant for a sum substantially less than the amount of the judgment. On the date of sale, a sheriff's certificate of sale was issued to appellant, under the terms of which and the law in force on the date of the execution of the note and the mortgage and the date of sale, appellant was entitled to a sheriff's deed upon the expiration of one year from the date of sale, unless the property was redeemed. Redemption was not made. On April 8, 1933, application was filed by appellee David T. Nordholm, asking that the period of redemption be extended to March 1, 1935, in conformity with the provisions of an act of the legislature (chapter 179, Acts of 45th Gen. Assem.) which had become effective on March 20, 1933. Resistance was made by appellant to this application. On April 21, 1933, the court made an order, the pertinent part of which extended the period of redemption until March 1, 1935. From such order this appeal is prosecuted.

The act of the Forty-fifth General Assembly, to which reference has just been made, reads as follows:

"An Emergency Act relating to the extension of the period of redemption of real estate in all real estate foreclosure actions now pending where deeds of conveyance have not been granted.

"Be it enacted by the General Assembly of the State of Iowa:

"Section 1. In any action, for a real estate foreclosure of a mortgage or a deed of trust, which has been commenced in any of the courts, and in which a decree has been or may hereafter be entered, but the redemption period, as now provided, has not expired, upon application of the owner or owners of such real estate, the court shall, unless upon hearing upon said application good cause is shown to the contrary, order that no sheriff's deed shall be issued until March 1, 1935, and in the meantime the such owner or owners may redeem such property, and are entitled to possession thereof.

"Provided, the court having jurisdiction of such foreclosure action shall order and direct, that there shall be applied from the income of said real estate so much thereof as is just and equitable, toward the payment of taxes accruing thereon during the period of redemption extension as provided by this act, and any balance distributed as the court may direct, and shall make such provision for the preservation of said property as will be just and equitable during the redemption period, and to this end the court may, in his discretion, in order to carry out the foregoing powers, appoint a receiver of said real estate, and invest said receiver with such powers as the court may find will be just and equitable to all parties to the proceeding.

"Providing, that in the event the said owner or owners do not comply with the orders of the court, the order for extension of redemption period as authorized by this act shall, on proper hearing, be set aside by order of the court.

"Sec. 2. During the period of extension of redemption, as herein provided, the owner or owners of said real estate shall have the exclusive right to redeem, and the rights of redemption of subsequent mortgagees, junior lienholders, and creditors shall terminate within the period as by law now provided, the provisions of this act notwithstanding.

"Sec. 3. During the period of extension of redemption, as herein provided, the clerk of the district court of the county in which such foreclosure action is brought, shall receive and disburse the income from said real estate, as the court shall order as just and equitable.

"Sec. 4. Any provision of any law or laws now in force, which

are in conflict with the provisions of this act, are hereby suspended until March 1, 1935.

"Sec. 5. From and after March 1, 1935, this act shall cease to be in force.

"Sec. 6. If any court of competent jurisdiction finds that any word, phrase, clause, sentence, or part of this act is unlawful it shall not invalidate any other part of this act.

"Sec. 7. This act being deemed of immediate importance shall be in full force and effect from and after its publication in the Sioux City Tribune, a newspaper published at Sioux City, Iowa, and the Davenport Democrat, a newspaper published at Davenport, Iowa."

I. Numerous objections were made to the application in the lower court and are urged in this court. The first objection requiring attention is that, as applied to the facts above stated, the act impairs the obligation of contracts and consequently is forbidden by article I, section 10, of the Constitution of the United States.

Notwithstanding the fact that a Minnesota statute extending the period of redemption was sustained by the Supreme Court of the United States against the objection that it contravened the Federal Constitution (Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398, 78 L. Ed. 255), it does not follow that the law under consideration is not vulnerable to such objection. The Minnesota statute specifically provides compensation in every instance to the mortgagee. Under the Minnesota statute, if redemption is not made at the end of the extended period of redemption, the reasonable rental value of the mortgaged property has been, or is, paid to or for the direct benefit of the mortgagee. Concerning this Mr. Chief Justice Hughes says:

"While the mortgagor remains in possession, he must pay the rental value as that value has been determined, upon notice and hearing, by the court. The rental value so paid is devoted to the carrying of the property by the application of the required payments to taxes, insurance, and interest on the mortgage indebtedness. While the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period."

And again:

"The mortgagor during the extended period is not ousted from

possession, but he must pay the rental value of the premises as ascertained in judicial proceedings and this amount is applied to the carrying of the property and to interest upon the indebtedness. The mortgagee-purchaser during the time that he cannot obtain possession thus is not left without compensation for the withholding of possession."

This is not true of the Iowa statute.

By the Iowa statute, the owner is given the right to possession of the mortgaged premises during the extended period of redemption. The language of the statute is:

"And in the meantime the such owner or owners may redeem such property, *and are entitled to possession thereof.*"

In the first instance the grant of the right of possession to the owner is absolute and unconditional. Whether the owner, if he elects to take or retain possession of the property, can be required to pay anything for the possession of the land, in view of the legislative grant of the right of possession, is at least subject to serious doubt. Still, if it be assumed that he must and does pay something for the possession of the land, does it follow from the language of the law that compensation will be made to the mortgagee? First, so much of the income of the land as is *just and equitable* shall be applied to the payment of taxes. Second, so much of the income as is *just and equitable* shall be applied toward the upkeep of the premises. Then, third, the balance, if any, shall be paid as the court may order as just and equitable. The language of the law is:

"Provided, the court * * * shall order and direct, that there shall be applied from the income of said real estate so much thereof as is just and equitable, toward the payment of taxes accruing thereon during the period of redemption extension, * * * and any balance distributed as the court may direct, and shall make such provision for the preservation of said property as will be just and equitable. * * *

"The clerk of the district court * * * shall receive and disburse the income from said real estate, as the court shall order as just and equitable."

It appears to be beyond cavil that the law contemplates that the balance may be ordered paid to the owner. The law does not

require that the taxes on the property be paid, or that the property be kept up. These things may be done. It does not require that the balance of income, remaining after whatever deductions for taxes and upkeep are made, be paid to the mortgagee. It may be paid to the mortgagee, or it may be paid to the mortgagor. It is no answer to say that the statute provides that the balance shall be disbursed as the court may order as just and equitable. To be valid under the Federal Constitution the law must provide compensation to the mortgagee. In the "rent cases" (Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 460, 65 L. Ed. 865, 16 A. L. R. 165; Edgar A. Levy Leasing Co. v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595), Mr. Justice Holmes, speaking for the Supreme Court of the United States, said:

"Machinery is provided to secure to the landlord a reasonable rent."

And in Home Building & Loan Association v. Blaisdell, supra, Mr. Chief Justice Hughes said in addition to the language above quoted:

"It will be observed that in the Bronson case, aside from the requirement as to the amount of the bid at the sale, the extension of the period of redemption was unconditional, and there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." And again:

"But in the Barnitz case, the statute contained a provision for the prevention of waste, and authorized the appointment of a receiver of the premises sold. Otherwise the extension of the period of redemption was unconditional, and, in case a receiver was appointed, the income during the period allowed for redemption, except what was necessary for repairs and to prevent waste, was still to go to the mortgagor.

"None of these cases, and we have cited those upon which appellant chiefly relies, is directly applicable to the question now before us in view of the conditions with which the Minnesota statute seeks to safeguard the interests of the mortgagee-purchaser during the extended period."

Under the law in force at the time the mortgage before us was made and at the time of sale under special execution, the mortgagee

was entitled to a sheriff's deed at the expiration of one year from the date of sale and to the possession of the property during the period through which the statute attempts to extend the right of redemption. These rights are taken away by the statute. Under the decisions of the Supreme Court of the United States, from which quotations have been made, compensation for such rights must be provided for *in the act* or it cannot be sustained. The only inference that can be drawn from the cases is that the reasonable rental of the property must be paid to or for the use of the mortgagee-purchaser. It may be that he cannot be heard to complain if taxes and reasonable cost of upkeep are paid out of income, for such expenditures inure to his benefit, but to be valid the act itself must provide that any remaining balance shall be paid to the mortgagee-purchaser.

It seems clear that the purpose of the law, disguised by the words "just and equitable", is to permit the income from the land to be paid to the mortgagor, whenever it may be made to appear to the court that the value of the premises at the expiration of the extended period of redemption is equal to or greater than the amount due on the judgment, or, if this is not the situation, that the court shall make distribution of the fund between the owner and the mortgagee-purchaser with the idea of adjusting present values and amounts due rather than in accordance with the rights of the parties under the law in force at the time the contract was made and the property sold on execution. If such purpose had been clearly expressed in the law, it would not pass the tests applied by the Supreme Court of the United States before permitting a law to stand against the ban of the Federal Constitution. The recent pronouncements of that court cannot be reconciled with a statute which permits the owner to remain in possession of mortgaged property during an extended period of a year and a half without the payment of rent to the mortgagee-purchaser, provided only the present value of the premises is equal to the amount due on the mortgage or judgment, or with one which provides for the division of the income from the land during the extended period of redemption on a basis of adjusting values and amounts due.

In this connection it cannot be contended logically that the court shall disburse the fund between the owner and the mortgagee-purchaser on the basis of computing interest due on the judgment or on the amount bid at execution sale.

It must be remembered that after execution sale the right of

the purchaser does not rest upon the note and mortgage alone; in fact, the rights of the purchaser spring from his purchase at the sale. It is recognized that when the mortgagee is purchaser at execution sale his rights are somewhat different than those of a purchaser who is a stranger to the mortgage. Bradley v. Lightcap, 195 U. S. 1, 24 S. Ct. 748, 49 L. Ed. 65. But so far as the land is concerned his rights after sale arise under the purchase. He has no claim based on a right to interest, unless redemption is made. He has a right to a sheriff's deed and a right to possession upon receipt of the sheriff's deed. Primarily the thing of value which he loses under the act is the right to possession of the land during the extended period of redemption. He does not lose a right to be paid interest. For cutting down his right to possession of the property compensation must be made, and of course the value of this right is not interest on the amount bid by him, but is, rather, the reasonable rental of the land. It has been pointed out that the Supreme Court of the United States has sustained the "rent laws" and the Minnesota moratorium law in view that the "rent laws" provided machinery by which the reasonable rental value of the property was assured to the landlord, and in the view that under the Minnesota statute the reasonable rental of the property is applied to the payment of taxes and upkeep of the premises and in payment for the rights of the purchaser cut down by the law. It is true that Mr. Justice Hughes says that the rental "is applied to the carrying of the property and to interest upon the indebtedness". But he repeatedly asserts that under the Minnesota law the mortgagee-purchaser is compensated to the extent of the rental value of the land for the loss of his right to possession. He says:

"While the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period."

If the Iowa statute contemplates that so much of the income as may remain after the payment of taxes, upkeep, and interest shall be paid to the owner, it cannot be sustained because less than reasonable compensation would be made to the purchaser for the rights taken from him. As a matter of fact the statute contains no suggestion that so much of the income as equals interest on the bid made by the purchaser shall be paid to the purchaser. If such disposition is made of such amount, it is not in virtue of any provision of the statute or of any existing law.

In fact, a most serious objection to the validity of the statute exists in its provisions in relation to the disbursement of the income. The legislature has not declared who shall be entitled to receive the fund. It is for the court to declare who shall have it. Under the law in force when the mortgage was made, the purchaser at execution sale was not entitled to possession of the land during the period of redemption; neither does the act under consideration give him such right during the extended period of redemption. His right to a sheriff's deed to the land does not mature until the expiration of the period of redemption. In this situation it seems clear that the mortgagee-purchaser has no present right to the income of the land, and it is equally clear that he will have no right to the income from the land at the expiration of the period of redemption. Notwithstanding the fact that provision must be made in the law to secure compensation to the mortgagee-purchaser, if the law is to be valid, the act does not provide that such compensation shall be made. The mortgagee-purchaser is not mentioned in the act. He is given nothing by the act. In this situation it is obvious that neither under the act nor under prior law has the mortgagee-purchaser such interest in the land as to give him any right to the fund. It will be said, of course, that since compensation must be made before the rights of the mortgagee-purchaser can be cut down, such fact gives him a right to the fund. The reply is that before the legislature can cut down such rights the legislature must provide that compensation be made to the mortgagee-purchaser. The act under consideration does not provide that compensation shall be made to the mortgagee-purchaser. If the mortgagee-purchaser receives any part of the income of the land, it must come through the court supplying a requisite to the validity of the law omitted by the legislature, namely, compensation to the mortgagee-purchaser. The statute gives the owner the right to possession of the premises during the extended period of redemption, but it must be assumed that this right to possession has been abridged by an obligation to pay rental for the land. If this is true, what right has the owner of the land to the fund which he has paid under the law for the possession of the land? Surely he has no right based on his ownership of the land, because under the law he has been obliged to pay for the right to its possession. It seems clear that the owner has no right to the fund, which is known to, or established by, law. The owner and the purchaser find themselves confronted with a fund which has been

created by the act in cutting down the rights of each in the land without creating in either any right to the fund. There is no way in which this fund can be distributed until new rights are created in it.

It is by the statute—not by its terms but by necessary implication—made the duty of courts to create such rights to the fund. Until a right to the fund is created in the owner, it cannot be paid to him, and the same must be said of the purchaser. The creation of this right is a legislative function. The distribution of the fund can never be achieved through the exercise of judicial functions, for a judicial examination of the rights of the owner and the purchaser would reveal that neither had any claim to it in law or in equity under any conceivable prior right. The district court, and this court, are constitutional tribunals and may never be vested with legislative functions. The legislature cannot endow such courts with legislative functions, nor can such courts assume to exercise legislative powers, even though granted by act of the General Assembly, Const. of Iowa, art. III, sec. 1; In re Appeal of Beasley Bros., 206 Iowa 229, 220 N. W. 306; State ex rel. White v. Barker, 116 Iowa 96, 89 N. W. 204. The determination of claims and rights to property is a proper judicial function but the creation of rights in property is purely a legislative function. The fund in the hands of the receiver can only be disbursed by and through the creation of original rights to it. The legislature has not created such rights. These rights cannot be created by constitutional courts.

It is no answer to say that the power of the court of equity is great. It is true that equity has been adequate in every judicial emergency. Under the Constitution of the State of Iowa, the legislative, executive, and judicial powers of government have been severed from each other and organized into co-ordinate departments of the state. The Constitution forbids the exercise of legislative powers by the judiciary.

The language used by the Supreme Court of the United States in the Home Building & Loan Association case and the "rent cases" indicates that the law under consideration cannot be considered an exercise of police power, (as Mr. Justice Holmes says in Block v. Hirsh, supra) "in its proper sense, under which property rights may be cut down, and to that extent taken, without pay." That court recognizes that acts of this character take property rights from the mortgagee-purchaser in a manner requiring that compensation be

made. The act takes from appellant two definite property rights: First, the right to possession of the property during the extended period of redemption. Second, the right to a sheriff's deed at the end of one year from the sale on special execution. Carried to their uttermost limit the cases referred to hold no more than that such property rights may be suspended for a reasonable length of time provided reasonable compensation is assured to the mortgagee-purchaser. The act in question does not even once mention the mortgagee or the purchaser at execution sale, or the obligation upon the mortgage or judgment. It makes no provision whatever for the payment of anything to the mortgagee-purchaser. In the absence of judicial legislation nothing can be paid to the mortgagee-purchaser. The failure of the legislature to make provision in the act for compensation to the mortgagee-purchaser leaves the act within the ban of the Federal Constitution under the cases above referred to.

It can be urged that the court may take into consideration the necessity of making compensation to the mortgagee-purchaser to sustain the validity of the act, when ordering the disbursement of the fund, in which event the mortgagee-purchaser would be paid for the rights cut down by the law. The trouble is that the General Assembly has not given heed to this need in framing the law. The validity of a law is determined by what it permits to be done, rather than by what is done under it in a particular instance. In Louisville & N. R. Co. v. Central Stock Yards Co., 212 U. S. 132, 29 S. Ct. 246, 248, 53 L. Ed. 441, the court said:

"The want (provisions for due process of law) cannot be cured by inserting them in judgments under it. The law itself must save the parties' rights, and not leave them to the discretion of the courts as such."

In Roller v. Holly, 176 U. S. 398, 20 S. Ct. 410, 44 L. Ed. 520, the court said:

"The right of a citizen to due process of law must rest upon a basis more substantial than favor or discretion."

In Stuart v. Palmer, 74 N. Y. 183, 30 Am. Rep. 289, it is said:

"It matters not, upon the question of the constitutionality of such a law, that the assessment has, in fact, been fairly apportioned. The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority, be done."

See, also, Hathorn v. Natural Carbonic Gas Co. 194 N. Y. 326, 87 N. E. 504, 128 Am. St. Rep. 555; Turner v. Eslick, 146 Tenn. 236, 240 S. W. 786; In re Lambert, 134 Cal. 626, 66 P. 851, 86 Am. St. Rep. 296; Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302, 60 Am. St. Rep. 609; Sterrit v. Young, 14 Wyo. 146, 82 P. 946, 116 Am. St. Rep. 994; Gatch v. City of Des Moines, 63 Iowa 718, 18 N. W. 310; Coe v. Armour Fertilizer Works, 237 U. S. 413, 35 S. Ct. 625, 59 L. Ed. 1027.

If a law may be interpreted in two ways, one sustaining the validity and the other making the act invalid, the act must be construed so as to sustain its validity. But the act as written cannot be construed in two ways, one requiring the income to be paid to the mortgagee-purchaser and the other requiring the income to be paid to the owner. The act under consideration cannot be construed to require the payment of the rental or income from the mortgaged premises to the mortgagee-purchaser, for it contains no mention of such matter. As has been said, the conclusion cannot be escaped that the General Assembly contemplated that the fund in the hands of the clerk would in many instances be paid in whole or in part to the mortgagor. The direction in the statute that the fund be disbursed as the court may order as just and equitable can have no other purpose. The validity of the statute cannot be upheld on the theory that the courts will supply elements essential to validity in their execution of the law. The statute must stand or fall on its own terms. The act contains no mention of the mortgagee-purchaser. It has no provision for his protection. If anything is paid to him, it will be in virtue of an order of court and not in virtue of the statute. This will not sustain the act in the light of the most recent pronouncement of the Supreme Court of the United States.

The law cannot be sustained. See Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra; Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. Ed. 93; Howard v. Bugbee, 24 How. (65 U. S.) 461, 16 L. Ed. 753; Bronson v. Kinzie, 1 How. (42 U. S.) 311, 11 L. Ed. 143; Bradley v. Lightcap, 195 U. S. 1, 24 S. Ct. 748, 49 L. Ed. 65.

II.   It is also contended that the act, as applied to the facts, impairs the obligation of the mortgage contract and, as a consequence, is void under the provisions of the Constitution of the State of Iowa. Article I, section 21, of the state Constitution provides:

"No bill of attainder, ex post facto law, or law impairing the obligation of contracts, shall ever be passed."

This provision protects the *obligation* of contracts against *impairment*. The questions naturally arise as to the character of the thing protected and the nature of the thing against which protection is afforded. The character of thing protected is fairly well defined by the decisions of this court. In Rosier v. Hale, 10 Iowa 470, reading on page 485, Mr. Justice Lowe, speaking for this court said:

"These authorities define to some extent, but not with entire precision, the distinction between a contract and the obligation of a contract, and they settle the principle that a state legislature cannot pass a law that shall act upon the one or the other; that is, vary or change the terms of a contract, or impair its obligation, referring thereby to the remedy appointed in the law for enforcing through certain prescribed forms the performance of the same, making the word 'obligation' mean, not the promise, not the moral duty or honor that binds the contracting party to keep his engagement, but the remedial process or coercive means which may be employed to compel the defaulting party to perform his agreement. It is by overlooking this distinction between the law of the contract and the law of procedure, which gives to contracts their binding force or efficiency, that the legislatures of this country are often betrayed into the enactment of laws striking at the remedy in a manner that threatens the inviolability of the obligations of contracts; and have thereby compelled the courts to interpose their authority, and to limit their operation to cases in futuro." See Leach v. Commercial Savings Bank, 205 Iowa 1154, 213 N. W. 517; Holland v. Dickerson, 41 Iowa 367; McCormick v. Rusch, 15 Iowa 127. And see, also, Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra, and cases therein cited. The thing against which protection is afforded by the constitutional provision is also well defined. Referring again from Rosier v. Hale, 10 Iowa 470, we find that this court has said:

"The doctrine laid down in the above cases is, that the law in force when the contract is made is necessarily referred to and forms a part of the contract, and fixes the rights and obligations growing out of it; and that any substantial change in the law of the remedy which shall lessen its efficiency, or burden it with new conditions and restrictions, comes within the constitutional prohibition."

In Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 1046, 41 L. Ed. 93, the Supreme Court of the United States said:

"Without pursuing the subject further, we hold that a statute which authorizes the redemption of property sold upon foreclosure of a mortgage, where no right of redemption previously existed, or which *extends the period of redemption beyond the time formerly allowed,* cannot constitutionally apply to a sale under a mortgage executed before its passage." (Italics are ours.) In McCracken v. Hayward, 2 How. (43 U. S.) 608, 11 L. Ed. 397, it is said:

"In placing the obligation of contracts under the protection of the Constitution, its framers looked to the essentials of the contract more than to the forms and modes of proceeding by which it was to be carried into execution; annulling all state legislation which impaired the obligation, it was left to the states to prescribe and shape the remedy to enforce it. The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party, and the right acquired by the other. There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. *If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract, in favor of one party, to the injury of the other;* hence any law, which in its operation amounts to a denial or obstruction of the rights accruing by a contract, *though professing to act only on the remedy,* is directly obnoxious to the prohibition of the Constitution." (Italics are ours.)

In this situation it is apparent that the holder of the mortgage has certain rights in both the mortgage and the remedy afforded by law for the enforcement of the mortgage, which are protected by this clause of the Constitution of the state. An examination of the decisions of this court reveals that this court has answered the question whether the act under consideration is void under the state Constitution.

As applied to the facts in the case before us, the law under consideration gives to the mortgagor a right of redemption from the 6th day of May, 1933, to March 1, 1935, which he did not have under the law in force at the time the mortgage was made, and takes from the purchaser at execution sale, who in this case is the mortgagee, the right to the possession of the property during such time and defers its right to a deed to the property for such period of time. None of such consequences attached to the remedies in force at the time the mortgage was made. By chapter 103 of the Acts of the 8th Gen. Assem., a right of redemption was given to the mortgagor during a period of one year after sale of mortgaged property on execution, and the right to a sheriff's deed to the property was deferred for such period of time. The question whether, as applied to mortgages executed prior to the adoption of the act, the act impaired the obligation of the mortgage, came before this court in Malony v. Fortune, 14 Iowa 417. It was there held that the act was void as applied to mortgages made before its adoption on account of the fact that it impaired the obligation of such contracts in violation of the Constitution. It will be said that the act then under consideration gave a new right of redemption where none at all had existed prior to the adoption of the act, but it must also be said that the act now under consideration gives a right of redemption during a time when no right existed, and that the consequences of the grant of the new right and the extension of the existing right are exactly the same, save only that the extension under the present act is nearly twice as long as under the act involved in the earlier case. We are concerned with the ultimate effect of the law on the obligation of the contract, and, if the earlier law was void as impairing the obligation of the contract, the present law is also void for the same reason, for the ultimate effect of the two acts upon the obligation of the contracts is the same. See, also, Olmstead v. Kellogg, 47 Iowa 460; Jordan v. Wimer, 45 Iowa 65; Burton v. Emerson, Shields & Co., 4 G. Greene, 393. And to indicate that the cases have not been overlooked reference is made to Holloway v. Sherman, 12 Iowa 282; Holland v. Dickerson, 41 Iowa 367; McCormick v. Rusch, 15 Iowa 127; and Hannahs v. Felt, 15 Iowa 141. Since the adoption of this provision of the Constitution, three major economic disturbances or depressions have passed over this state and nation. The cases have stood unchallenged for over fifty years. During that time the Constitution of the state has been amended by the people on seven

different occasions. The provision has not been amended or altered in any respect. Upon the authority of the decisions of this court it must be held that as applied to the facts in the case at bar the act is a violation of the Constitution of the State of Iowa.

But independent of the authority of such decisions such conclusion cannot be escaped. The prohibition of laws impairing the obligation of contracts is of American origin. The evils against which it was directed were the repudiation of debts and acts which are generally known as debtors relief laws. No one can read history and come to the conclusion that the quoted clause of the Constitution of Iowa was not directed especially against the enactment of laws of the character of the one under consideration. It was with laws of this class that the people of the whole nation had had recent experience. They were known to be laws which impaired the obligation of contracts. Neither can one read history and conclude that the clause was not intended to be an absolute and unqualified prohibition of the enactment of such laws. The utter ruin following their enactment was not then merely a matter of history and tradition. It was a matter with which many then living had had bitter experience. Reading from page 37 of Shambaugh's Iowa Constitutional Debates, we find the following in relation to the Convention of 1844:

"Mr. Davidson moved an addition to the 20th Article (which forbids 'laws impairing the obligations of contracts,') in order to make it more comprehensible to the common people. The meaning would be the same, but they could understand it better.

"Mr. Grant thought it better to let it be as it was, as decisions had been had upon these words, and their legal character was ascertained. They forbid every kind of legislative interference with contracts.

"Mr. Davidson withdrew his amendment, but immediately after Mr. Hempstead and Mr. Galbraith each proposed amendments of similar character; but they failed to take effect on the convention."

The case of Bronson v. Kinzie, 1 How. (42 U. S.) 311, 11 L. Ed. 143, had been decided recently by the Supreme Court of the United States, holding invalid a statute of the state of Illinois attempting to afford relief to debtors, harassed by the "depression" of 1837, by extending the right of redemption, had in other causes, to actions for the foreclosure of mortgages, for the reason that the obligation of contracts was thereby impaired. With this background we find that

the Constitutional Convention wrote into the Constitution of the state: "No * * * law impairing the obligation of contracts, shall ever be passed."

And in this situation we find the Constitution adopted by the people of Iowa. It is to be particularly noted that this language is not that no law impairing the obligation of contracts shall ever be passed *unless compensation is made* to the party whose rights are cut down. The language is simply that no such law shall ever be passed.

This background, and these considerations, are important in determining the question before us. In Halsey & Co. v. City of Belle Plaine, 128 Iowa 467, 104 N. W. 494, we said:

"In proceeding to give construction to a provision of the Constitution, it is of importance that we begin by making ascertainment of the particular object intended to be subserved. To this end we are required primarily to look to the words employed, giving to them meaning in their natural sense and as commonly understood. If necessary to a fuller understanding, we may place ourselves in touch with the makers of the instrument, and share in their view of the general subject by reading the constitutional debates; also the contemporary legislation, if any, having relation to the subject-matter. We may take note of the evil as manifestly sought to be remedied or guarded against, and of the conditions to be affected, then existing or reasonably to be apprehended in the future, and as disclosed by the authentic history of the state."

How can the law be sustained? The courts are a unit in holding that such laws impair the obligation of contracts. The parties admit that it does so. A reading of the words of the Constitution lends no comfort, for they forbid the enactment of laws impairing the obligation of contracts. The words themselves cannot be construed to warrant the enactment of the law. What is there in the background to warrant a holding that the language used was not intended to apply to the act in question? It cannot be contended that economic disturbances, with their consequent hardships and "emergencies" were unknown to the people. They had just passed through one shortly before the first Constitution was adopted, and the Constitutional Convention of 1857 was held while another great "depression" was taking its toll of misery and hardship. Laws of

the kind under consideration were known to the people to be laws impairing the obligation of contracts and had been held to be such by the courts. The fact that hard-pressed debtors would cry for relief of this character was well known to them, and the poignancy of their appeal and the inability of men in power to resist such demands and appeals were undoubtedly the considerations which prompted the incorporation of the clause in the Constitution. The more the background is examined the more inevitable becomes the conclusion that the language of the Constitution now under consideration was especially directed against laws like the one before us. If the words, "No * * * law impairing the obligation of contracts shall ever be passed," do not deny the power to pass the act now before us, such denial will never be written by the pen of man. The letter, the spirit, and the intent of the provision all condemn the act. *The only way in which the law can be sustained is by holding that the Constitution does not forbid that which its terms and the intention of its makers forever proscribe.*

And in this connection it may be well to note another provision of the Constitution of Iowa. Article XII, section 1, reads:

"This Constitution shall be the supreme law of the State, and any law inconsistent therewith, shall be void." It is not the courts or the General Assembly that have made the Constitution the supreme law of the state. The people have done so. It is not the courts that have forbidden the General Assembly to impair the obligation of contracts. The people have done so. The people have not only ordained that no such a law shall ever be passed, but they have ordained that any such law after being passed shall be void. The judges of this court are bound by oath to support the Constitution of the state. The question before it is whether a law impairing the obligation of a contract is void. The people themselves have answered the question in the language of the Constitution last above quoted. They have said it is void. The answer of the people to the question cannot be set aside by saying that the people have not prohibited that which they have forever forbidden.

The Constitution of the United States provides that:

"No State shall * * * pass any * * * Law impairing the Obligation of Contracts."

It will be said that the provision of the Constitution of the state

of Iowa is but a reaffirmance of the prohibition of the Federal Constitution, under which the state may under some circumstances pass laws similar in some respects to the one under consideration. Home Building & Loan Association v. Blaisdell (290 U. S. 398), supra.

Let us examine the matter to ascertain whether this is true. If at the time of the adoption of the Constitution of the state of Iowa it was the understanding of the people of the state that under the Federal Constitution the state of Iowa had no power to enact laws of the kind under consideration, and the limitation so understood was affirmed in the language of the Iowa Constitution above quoted, why should not the language be construed as it was understood by the people who adopted it? If, in the adoption of the state Constitution, the people of the state intended to affirm a prohibition of laws of the kind under consideration, the Constitution should be so construed as to effectuate the intended prohibition. If, on the other hand, the people of the state understood that the state had power to pass laws of this kind under certain circumstances, why did they write into the Constitution, "No * * * law impairing the obligation of contracts, shall *ever* be passed"? For what purpose could the word "ever" be used except to deny the power at every time and under every circumstance? The people of the state have gone beyond the Federal Constitution. They have ordained that no such law shall *ever* be passed.

It is conceded that the act, as applied to the facts in this case, would be unconstitutional in normal times; but it is contended that the act is a proper exercise of police power in view of the emergency referred to in the act. It is said that the power of government is inherent in the people and that the object of government is the common good. From this it is inferred that there is reserved in the people of the state a power which the legislature may use for the common good in time of emergency, without transgressing the Constitution of the state.

As a background for the discussion of this problem, it will be well to state certain fundamental facts in relation to the source of legislative power. Under our scheme and theory of government the full power of government was originally possessed by the people. By the Constitution of the United States the people of the nation entered into a covenant with each other for the creation of a government. By it the people divided the powers of government into three divisions, namely, legislative, executive, and judicial. Certain

legislative powers were given to Congress. Certain legislative acts were forbidden to Congress. Certain legislative acts were forbidden to the states. All legislative power of government not given to Congress and not denied to the states, and not reserved to the people of the whole nation, was reserved to the people of the states. Under the national Constitution Congress has only such legislative power as is delegated to it by the Constitution. A very materially different situation exists in the state. The covenant of the people of the state of Iowa with each other, by which the state government was created, is the Constitution of the state of Iowa. The people of the state of Iowa also divided their power of government into the legislative, executive, and judicial departments. Through the Constitution of the state the people of Iowa denied certain specified powers to the General Assembly. The passage of acts of designated character was forbidden to the General Assembly. But aside from such prohibited acts the full legislative power of the state was vested in the General Assembly. This was done in the following language:

"The legislative authority of this State shall be vested in a General Assembly."

By the process outlined above we find that the complete and absolute legislative power had in the beginning by the people of the whole nation has been distributed as follows:

1. Certain power has been exclusively granted to the national government by the people of the whole nation, through the Federal Constitution.

2. The exercise of the portion of the residue has been forbidden to the states by the people of the whole nation through the Federal Constitution.

3. A portion of power which was *not given* to Congress, and which *was denied* to the states, has been reserved to the people of the nation through the Federal Constitution.

4. All other power has been reserved to the several states.

5. The exercise of a portion of the power reserved to the state has been denied to the General Assembly by the people of the state of Iowa through the Constitution of the state.

6. All legislative power of the state, not denied in terms to the General Assembly, is vested in the General Assembly.

Upon an examination of the enumerated powers granted by the Federal Constitution to the federal government and a consideration of

the functions which should be exercised by the national government, it is evident that in some respects a fundamental deficiency in power exists. To meet this situation it has been held, in effect, that in so far as the people of the United States created their government in the adoption of the Constitution, by its adoption the government of the United States was vested under a general grant with the powers necessary for its existence and the exercise of its proper functions, notwithstanding the absence of an enumerated and specific grant thereof and the reservation of ungranted and undenied power to the states and the people. Such power has no counterpart, in point or source, in the state of Iowa, for as hereinbefore related all legislative power of the state, not in terms denied, has been vested in the General Assembly. Strictly speaking there is no ungranted, undenied, legislative power in the state of Iowa. All legislative power which the people of the state have, has been specifically denied to the legislature or specifically granted to it. The power of the General Assembly can only be enlarged by encroaching on power denied to it.

The exercise of legislative power in the form of regulatory acts is said to be an exercise of "police power". Under the name "police power" the legislative power of the national government has been enlarged beyond the enumerated specific grants of power of the Federal Constitution, but as hereinbefore stated, there can be no such enlargement of the power of the General Assembly of the state, because all power, not delegated to the General Assembly, has been in terms denied to it. This is a controlling consideration, for the quest in this case is for an enlargement of legislative power through exigencies of the emergency.

From the foregoing statement of elementary principles and obvious truths it is apparent that the General Assembly has no latent legislative power that springs into being in times of emergency and that *it has at all times the entire legislative power of the state*, excepting only the powers denied to it in terms by the people of the state in the Constitution of the state of Iowa.

It has frequently been held that the public health, public morals, public well-being, and the general good are objectives in behalf of which the police power may be exercised. As applied to these objectives the courts have recognized that the police power is very great. In sustaining the validity of laws crowding closely to the proper limits of police power the courts have painted the police power as being of vague origin and of mighty although indefinite

power. In order to escape the consequence of the conflict between the law under consideration and the Constitution, these expressions of the courts are referred to, not exactly for the purpose of directly assailing the supremacy of the Constitution, but for the purpose of establishing through such language the existence of a power in the General Assembly which can nevertheless override the Constitution. In every instance the thought is expressed that there is a "reserved power" which the General Assembly may use, and the inference to be drawn therefrom is that the act, being passed in the exercise of this "reserved power", is valid even though forbidden by the Constitution, the supreme law of the state. The conception of such reserved power is intriguing, until an examination of the structure of our state government reveals that there is and can be no such reserved power. There can be no such reserved power for the simple reason that the only reserved legislative power existing in the state is legislative power which has been denied to the General Assembly. This power has not been reserved to the legislature. It has been denied to the General Assembly and reserved to the people. The reserved legislative power in the state of Iowa is the power to pass laws which the bill of rights of the Constitution declares shall never be passed. When the theory of "reserved power" is stripped of its verbiage, it is simply an assertion that the General Assembly, in the exercise of powers given to it by the Constitution, can pass laws which the Constitution ordains shall never be passed.

It is argued that the limits recognized as being proper for the exercise of police power were sufficiently extended by the decisions of the Supreme Court of the United States in the "rent cases" (Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865; Edgar A. Levy Leasing Co. v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595) to warrant the enactment of the law under consideration by the General Assembly, under the theory that the emergency had enlarged its power. In response to this argument it is only necessary to quote the following language from the opinion of Mr. Chief Justice Hughes in the case of Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231:

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a pe-

riod of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency."

This is equally true of the power of the General Assembly under the Constitution of Iowa.

Emergency cannot enable the General Assembly to pass laws which the Constitution forbids. Changing conditions resulting from or in emergencies may extend the fields subject to regulation under police power and make regulations reasonable that under ordinary circumstances would be unreasonable, but this does not mean that emergencies clothe the General Assembly with power to transgress the Constitution, for even in emergencies the Constitution is supreme.

The Constitution of the state of Iowa, like the Constitution of the United States, was intended to endure in the future. It was made and adopted for the purpose of creating a government for a growing commonwealth. It was intended for a progressive and changing social order. The great scope of its grant of legislative power to the General Assembly is evidence, at once, of the intention of its framers that the government created by it should have great and "elastic" powers, in the future, and of the intention that the legislature should not encroach upon forbidden powers. A grant of broad power is not consistent with the thought that denied power shall be lightly encroached upon. The framers of the Constitution and the people of Iowa, who adopted the Constitution not only secured the personal liberties of the people and created a form of government for the state by the Constitution, but by it they gave to their economic structure the incidents which attend upon the secure ownership of property by the citizen and the inviolability of the obligation of contracts. The personal liberties of the people of the state are protected only by the provision of the Constitution that they shall not be invaded, and by the declaration of the Constitution that it is the supreme law of the state and that every law inconsistent with it shall be null and void. The right of the people to have their government operated by executive, legislative, and judicial officers chosen by them is secured to them only by the provisions of the Constitution. In the same Constitution and in the same bill of rights that secures to the citizen his personal liberties are the provisions that his property shall not be taken from him without due process of law and that the obligation of his contracts shall not be impaired. In the

Home Building & Loan Association case Mr. Chief Justice Hughes points out that the Federal Constitution cannot be held to have such elasticity as to permit a state to be represented in the national senate by more than two senators. There can be no elasticity in that respect because the Constitution of the United States says that the state shall have but two senators. By the same token the personal liberties of the people of Iowa specifically guaranteed by the Constitution cannot be invaded, because there is no elasticity in the specific guaranty of the Constitution. No personal liberty or right is more specifically guarded by the Constitution than is the obligation of contracts against impairment. No matter how fine spun the reasoning may be, the bald fact remains that whether the assault be made under the guise of "emergency" or "elasticity" the same philosophy which permits the obligation of contracts to be impaired by the enactment of laws, in terms and in intent prohibited by the Constitution, must sustain the destruction of every personal liberty and property right in terms and in intent guaranteed to the individual citizen of the state by the Constitution of Iowa.

Neither personal liberty nor property rights are sacred against the full power of government. They may be cut down and destroyed. But in the creation of the government of Iowa the people of the state, wisely or otherwise, reserved certain power to themselves. Among these are the power to cut down certain personal rights, to take property without due process of law, to impair the obligation of contracts, and to create a new form of government. Right or wrong, it was conceived by the makers of the Constitution that these powers should be denied to the General Assembly, and they were denied, under positive prohibition and ban of invalidity.

The need of power on the part of the General Assembly to encroach upon the power denied to it, the need of adaptability or elasticity in specific prohibitions of the Constitution, is eliminated by its provisions for its amendment. When the development of the commonwealth is being hindered or throttled by the prohibitions of the constitution, it may be amended by the people. Wisely or otherwise, the framers of the Constitution and the people who adopted it set great store in the rights which they reserved in themselves—the rights to be secure in their persons, their property, and their contracts. These rights cannot be taken from the people by the General Assembly or by the courts. They may be surrendered by the people only through the process of amending the Constitu-

tion of the state. They cannot be taken away by the General Assembly because of an emergency, because emergency does not enhance the power of the legislature, nor under the guise of an exercise of police power because police power cannot transgress the Constitution, nor under the pretense that the language used to prohibit their invasion, three-quarters of a century ago, is not still a prohibition, because neither time nor circumstance can change the meaning of a prohibition of a specific thing.

The proper determination of this appeal does not require that the police power be redefined or that it be limited or restricted within new limits. It has always been recognized that the Constitution is the supreme law of the state and that police power cannot exceed the restraints of the Constitution. What was said by Mr. Justice DeGraff in Iowa Motor Vehicle Assn. v. Board of Railroad Commissioners, 207 Iowa 461, 221 N. W. 364, in regard to the Constitution of the United States, is equally applicable to the state Constitution. He said:

"The Constitution of the United States is the supreme law, anything in the Constitution or statutes of the states to the contrary notwithstanding, and a statute of a state, even when avowedly enacted in the exercise of its police powers, must yield to that law. As said in Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679:

" 'No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived.' "

In State v. Hutchinson Ice Cream Co., 168 Iowa 1, 147 N. W. 195, speaking of the police power we said:

"The power is broad, but subordinate to the Constitution."

See, also, Waud v. Crawford, 160 Iowa 432, 141 N. W. 1041; City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 184 N. W. 823, 188 N. W. 921; Grand Trunk Western R. Co. v. South Bend, 227 U. S. 544, 33 S. Ct. 303, 57 L. Ed. 633; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679; Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. Ed. 169; Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385; Henderson

v. Wickham, 92 U. S. 259, 23 L. Ed. 543; Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778; Jacobson v. Massachusetts, 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643; Shevlin-Carpenter Co. v. Minnesota, 218 U. S. 57, 30 S. Ct. 663, 54 L. Ed. 930; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112; Eubank v. Richmond, 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156; International Paper Co. v. Massachusetts, 246 U. S. 135, 38 S. Ct. 292, 62 L. Ed. 624.

It is but a subterfuge to say that a specific prohibition contained in the Constitution does not mean today what it meant when the Constitution was adopted. In all fields in which the exercise of governmental functions is invited and limited by necessities, legislative regulation will be an ever changing thing. In such fields the aspect is seldom the same from year to year, and changes are profound from generation to generation. But there has been, and will be, no change in the aspect of governmental functions or problems which can change the meaning of the concept carried by Moses from the mountain top: "Thou shalt not steal." In a nation of 125,000,000 people it means the same as it did to the handful of the "chosen people". No more can it be said that the language, "No * * * law impairing the obligation of contracts, shall ever be passed", does not mean the same today that it did in 1846. We are committed to the rule that flight of time and change in conditions do not alter the meaning of such provisions of the Constitution from that intended and understood by those who framed and adopted the Constitution. In Hunter v. Colfax Consolidated Coal Co., 175 Iowa 245, 154 N. W. 1037, 157 N. W. 145, we said:

"The rules for dealing with the fundamental law that are urged upon us present, in effect, an assertion that the judges of the present day may repeal the Constitution whenever, in their opinion, that instrument is out of harmony with 'the light of twentieth century conditions and ideals.' This is akin to the other theory that judges should create law whenever convinced that it is salutary and demanded by the people. The age of the Constitution and the enlightenment and progressiveness of the judge have not the slightest bearing upon whether a Legislature has or has not made some particular thing into law. Nor is the Constitution a public enemy whom judges are charged to disarm whenever possible. It is the protector of the people, placed on guard by them to save the rights

of the people against injury by the people. To hold that attack upon it is for the public good is to commend the soldier for tearing down the rampart which enables him to sleep in safety. The age of the Constitution may develop conditions which make it desirable to amend it; until amended, it is a holy covenant, which judges are not at liberty to emasculate by urging a species of statute of limitations. The oath of the judge to support it has neither an express nor implied exception that the oath shall not be binding after the Constitution has been in existence for a stated, or any, length of time. Unless amended, it will be the duty of the judges who serve a hundred years from now to obey this Constitution. The judge can give no more irrefragable evidence of his utter unfitness for his high trust than that he allows his notions of necessity and justice, or his responsiveness to the public will, to influence him in determining whether a law has been enacted. And in no conceivable case may the just judge give effect to legislation which clearly violates the fundamental law. None but foresworn judges will yield to these to any degree of necessity, or pressure of public opinion, or disregard the Constitution because it was created in the eighteenth or nineteenth century. Those who insist most strongly that the courts shall legislate or set aside the Constitution in a given way and case will be the most clamant in condemning any such action when it interferes with law that they favor."

Before closing the discussion it may be well to bring into juxtaposition the ultimate positions which the parties must take under the state Constitution. The position of appellant is that the enactment of the act is within the letter and intent of the constitutional prohibition. The position of appellee is that the prohibition of the Constitution is not absolute but permits the enactment of such laws when necessity reasonably requires their enactment. The first section of the bill of rights (article I of the Constitution) declares that all men are free and equal and have, among others, the inalienable right "of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness." Section 3 provides: "The General Assembly shall make no law respecting an establishment of religion," etc. Section 7 provides no law shall be passed to "restrain or abridge the liberty of speech, or of the press." Section 9 provides that "the right of trial by jury shall remain inviolate," and that "no

person shall be deprived of life, liberty, or property, without due process of law." By section 21 (the section under consideration) it is provided that "no bill of attainder, ex post facto law, or law impairing the obligation of contracts, shall ever be passed." Not all the sections of the bill of rights have been enumerated above, but only a sufficient number to indicate the general phraseology of the sections and the general nature of their subject-matter. Personal rights and liberties of one citizen are not held to the exclusion of personal rights and liberties in others. The personal rights and liberties guaranteed to the citizen are such as are consonant with the personal rights and liberties of others. Notwithstanding the constitutional guaranty, in fact to make the guaranty effective, personal rights and liberties are restricted by law from unbridled license to rights and liberties consistent with rights and liberties in others. Property is acquired, possessed, and protected from others and against others. The very guaranty of the right to protect property implies a duty on the part of each owner of property to respect the rights of others in property. And in order that the guaranty may be a living thing the law holds the rights of one property owner within the limits prescribed by the rights of others. And so it is with the other relative and abstract rights reserved to the people in the bill of rights. In the matter of adjusting the rights of one so that another may also have his rights, the interest of each in public health, morals, and well-being is a controlling factor. The true function of police power is the adjustment of these relationships between men. The effective maintenance of the constitutional guaranties makes imperative the use of the police power, and it is in this view that the exercise of police power to maintain the respective rights of men guaranteed by the Constitution has been held to be within the contemplation of the makers of the Constitution and permissible under its terms, even though rights are thereby restrained and the use of property restricted. But the end of the police power is reached when the rights of others have been protected, and when rights are cut down in order that others may profit thereby, the limit of police power has been exceeded, for then the guaranty of the Constitution has been violated.

And so it is with the provision that no law impairing the obligation of contracts shall ever be passed. In the exercise of police power—in the maintenance of that order in which the rights guaranteed by the Constitution are effectively secured to the citizens of

the state—contracts between individuals may become unenforceable. Still the obligation of contracts is not thereby impaired for all contracts are of necessity made subject to the power of the state to maintain such order. The contract fails because its original obligation has in it the contingency of failure. The obligation has not been impaired. It was not adequate in the first instance on account of·the fact that the contingency inhered in it. So far as the obligation of contracts, valid when made, may fail as a result of proper legislative exercise of police power, the clause of the Constitution is not violated because the Constitution contemplates, and in fact, as above noted, requires the exercise of police power. Drady v. D. M. & Ft. D. R. Co., 57 Iowa 393, 10 N. W. 754; Legal Tender cases (Knox v. Lee), 12 Wall. 457, 20 L. Ed. 287; Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297; Manigault v. Springs, 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274; Scranton v. Wheeler, 179 U. S. 141, 21 S. Ct. 48, 45 L. Ed. 126. But exactly as personal liberty and property rights, guaranteed by the Constitution, cannot be cut down under police power in order that one or many may profit from their destruction, so the obligation of contracts cannot be impaired only that one or many may profit by the impairment. The act in question does no more than impair the obligation of the mortgage contract and take from the mortgagee-purchaser the right to possession and a sheriff's deed at the end of one year from the date of execution sale, in the hope that by the wholesale destruction of like obligations and rights the economic welfare of the state will be enhanced. Such obligations and rights are guaranteed against destruction for that purpose by the Constitution of the state.

Baldly stated, to sustain the law it must be held that the legislature can do with personal liberties, private property rights, and the obligation of contracts whatever it pleases, if the object of its legislative acts is the common good and its acts are reasonably addressed to that end. Then the bill of rights becomes a mere illusion. Then the rights guaranteed by the Constitution need no longer yield only sufficiently to give parity of right to all other citizens of the state, but such rights may be despoiled whenever the common good may demand it. Then the fundamental theory of American government that the private citizen holds his liberties and rights and property secure against the state and its people must be abandoned, and in its stead we must set up the practice that cuts down every liberty

and every personal and private right whenever the common good may demand it. Such practice is not consonant with the declaration of the bill of rights that the right of "enjoying and defending life and liberty, acquiring, possessing and protecting property" is inalienable; that "no person shall be deprived of life, liberty, or property, without due process of law"; that "no bill of attainder, ex post facto law, or law impairing the obligation of contracts, shall ever be passed"; or with its declarations intended to secure civil and religious freedom. Such practice is not the one established by the Constitution of Iowa. Under it the private citizen must concede equality of right to his fellow citizen in personal freedom and liberties and in "acquiring *possessing* and *protecting* property", but he need not go beyond this in sacrificing his liberty, freedom, or property, in the name of the common good. The people have the right to establish the new order and the new practice by amendment to the Constitution, but the General Assembly cannot do so, for its power cannot destroy the structure of government created by the people.

The courts are agreed that proper exercise of police power does not impair the obligation of contracts, even though thereby the obligation of contracts may fail. They are practically a unit in holding that laws of the kind under consideration do impair the obligation of contracts. State ex rel. Cleveringa v. Klein (N. D.) 249 N. W. 118; Wilder v. Campbell, 4 Idaho 695, 43 P. 677; Phinney v. Phinney, 81 Me. 450, 17 A. 405; State ex rel. Thomas Cruse Sav. Bank v. Gilliam, 18 Mont. 94, 44 P. 394, 45 P. 661; Hollister v. Donahoe, 11 S. D. 497, 78 N. W. 959; State ex rel. Akerson, Gooch & Co. v. Hurlburt, 93 Or. 34, 182 P. 169; Savings Bank v. Barrett, 126 Cal. 413, 58 P. 914; Paris v. Nordburg, 6 Kan. App. 260, 51 P. 799; Murphy v. Phillips (Tex. Civ. App.) 63 S. W. (2d) 404; Life Ins. Co. v. Sanders (Tex. Civ. App.) 62 S. W. (2d) 348. The enactment of such a law is prohibited by the Constitution of Iowa under penalty of invalidity.

I would reverse the order of the trial court. I am authorized to say that Mr. Justice ALBERT concurs in this dissent.

STEVENS, J. (dissenting)—I am of the opinion that chapter 179, Acts of the Forty-fifth General Assembly, is, under the authority of Home Building & Loan Association v. Blaisdell, recently decided by the Supreme Court of the United States, unconstitutional. The

act contains no definite provision for making compensation to ·the mortgagee. So far as any provision is made in this respect by the act, it is to be by the court sitting in equity.

I therefore, concur in the dissenting opinion of Chief Justice CLAUSSEN so far as it deals with this phase of the question.

KINTZINGER, J. (dissenting)—The United States Supreme Court, in Home Building Corporation v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 255, 88 A. L. R. 1481, held that the Minnesota Redemption Statute does not violate *the Constitution of the United States*. It is questionable whether the Minnesota statute is substantially similar to the Iowa act. An assumption that it is, would require us to hold that the Iowa statute does not violate the Constitution of the United States, and render it unnecessary to consider this branch of the case. The decision in that case does not, however, require us to hold that the Iowa act does not violate the *Iowa* constitution.

The question before us, therefore, is whether or not the Iowa statute violates the Iowa constitution.

Article I, section 21, of our constitution provides as follows: "No * * * law impairing the obligation of contracts, *shall ever* be passed." Section 1, article XII, of our constitution provides: "This Constitution shall be the supreme law of the State, *and any law inconsistent therewith,* shall be void." (Italics ours.)

In a discussion of this question it is well to note what Chief Justice Marshall said in 1810 in the case of Fletcher v. Peck, 6 Cranch 87, 3 L. Ed. 162, loc. cit. 175. In that case the court said:

"The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its power, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other. * * * Is the clause to be considered as inhibiting the state from impairing the

obligation of contracts between two individuals, but as excluding from that inhibition contracts made with itself? * * * Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights for the people of each state."

It is contended by appellant that the Iowa redemption statute, as applied to the facts in this case, does impair the obligation of the mortgage contract in question, and is therefore "inconsistent" with the foregoing constitutional provisions, and as such is invalid. It is conceded that the Iowa statute as applied to the facts in this case does extend the period of redemption beyond the time allowed under the former statute; it is also conceded that a judgment and decree of foreclosure was entered and sale made thereunder several months prior to the enactment of the new statute.

The questions for determination therefore are: (1) Does the statute impair the obligation of the contract? and (2) is it invalid because of the provisions that (a) "no * * * law impairing the obligation of contracts shall ever be passed," and (b) that "this constitution shall be the supreme law of the state, *and any law inconsistent therewith shall be void*"?

I. The first question for consideration, therefore, is whether or not the new statute extending the period of redemption impairs the obligation of the contract.

A consideration of this preliminary question does not involve a consideration of the power to enact such a statute during a time of emergency. If it can be held to impair the obligation of a contract in normal times, can it mean that it does not impair such obligation in abnormal times? Would it be inconsistent to say that it impairs the obligation of a contract at one time, and does not impair such an obligation at another? Can it be given one meaning at one time and a contrary meaning at another?

"The obligation of a contract includes everything within its

obligatory scope. Among these elements nothing is more important than the means of enforcement. This is the breath of its vital existence. Without it, the contract, as such, in the view of the law, ceases to be, and falls into the class of those 'imperfect obligations', as they are termed, which depend for their fulfillment upon the will and conscience of those upon whom they rest. The ideas of right and remedy are inseparable. 'Want of right and want of remedy are the same thing.' * * * It is also the settled doctrine * * * that the laws which subsist at the time and place of making a contract enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This rule embraces alike those which affect its validity, construction, discharge and enforcement." Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Von Hoffman v. Quincy, 4 Wall. (71 U. S.) 535, 18 L. Ed. 403. The doctrine is well settled that "a statute which authorizes the redemption of property, sold on execution or foreclosure in satisfaction of a former contract, where such right of redemption did not exist before, or which extends the time allowed for such redemption, impairs the obligation of the contract in satisfaction of which the foreclosure or execution is sought. The same objection applies to a statute increasing the time that must elapse between the rendition of a judgment and a sale of the land." 3 Page on Contracts, section 1777, p. 2692 (1st Ed.).

The general rule of law is that a statute which gives a right of redemption of property sold on foreclosure of a mortgage, where no right of redemption previously existed, or which extends the period of redemption formerly allowed, is void as to sales under mortgages executed before its passage. 12 C. J. 1077; 12 C. J. 1071; Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. Ed. 93; 6 R. C. L. 365; Rosier v. Hale, 10 Iowa 470; Malony v. Fortune, 14 Iowa 417; Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143; McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397; Gantly v. Ewing, 3 How. 707, 11 L. Ed. 794; Howard v. Bugbee, 24 How. 461, 16 L. Ed. 753; Gunn v. Barry, 15 Wall. 610, 21 L. Ed. 212; Walker v. Whitehead, 16 Wall. 314, 21 L. Ed. 357; Murray v. Charleston, 96 U. S. 432, 24 L. Ed. 760; Nelson v. St. Martin's Parish, 111 U. S. 716, 4 S. Ct. 648, 28 L. Ed. 574; Fletcher v. Peck, 6 Cranch 87, 3 L. Ed. 162; Watkins v. Glenn, 55 Kan. 417, 40 P. 316; State v. Gilliam, 18 Mont. 94, 44 P. 394, 45 P. 661; Turk v. Mayberry, 32 Okl. 66,

121 P. 665; State v. Hurlburt, 93 Or. 34, 182 P. 169; Phinney v. Phinney, 81 Me. 450, 17 A. 405; Hudgins v. Morrow, 47 Ark. 515, 2 S. W. 104; International Building & Loan Assn. v. Hardy, 86 Tex. 610, 26 S. W. 497; Oshkosh Water Works v. Oshkosh, 187 U. S. 437, 23 S. Ct. 234, 47 L. Ed. 249; Conley v. Barton, 260 U. S. 677, 43 S. Ct. 238, 67 L. Ed. 456; American & Eng. Enc. of Law (2d Ed.) vol. 15, 1056; Hollister v. Donahoe, 11 S. D. 497, 78 N. W. 959; Bradley v. Lightcap, 195 U. S. 1, 24 S. Ct. 748, 49 L. Ed. 65; Cargill v. Power, 1 Mich. 369; Daniels v. Tearney, 102 U. S. 415, 26 L. Ed. 187; Lamb v. Powder River Live Stock Co. (C. C. A.) 132 F. 434; Smith v. Spillman, 135 Ark..279, 205 S. W. 107, 1 A. L. R. 136.

This rule is recognized by the United States Supreme Court and by the courts of practically all the states. In fact, it is so thoroughly recognized that the appellee in his brief and argument "concedes that in normal times and under usual and ordinary conditions a majority of the courts have held such legislation as House File 350 to be unconstitutional. In ordinary times there would be no reason or excuse for such legislation and no demand for it". The reason advanced in practically all the cases for holding such legislation unconstitutional is that it impairs the obligation of the contract. The question now before this court is not new in Iowa, but was determined by this court in early history of the state, and has been recognized as the rule in Iowa for over 70 years.

In Rosier v. Hale, 10 Iowa 470, loc. cit. 485, our court said:

"The doctrine * * * is that the law in force when the contract is made is necessarily referred to and forms a part of the contract, and fixes the rights and obligations growing out of it; and that any substantial change in the law of the remedy which shall lessen its efficiency, or burden it with new conditions and restrictions, comes within the constitutional prohibition."

In that case we held that an act to provide for the appraisement of property sold under execution, approved in March, 1860, cannot constitutionally apply to contracts entered into before it was enacted, because it would be unconstitutional as impairing the obligation of the contract.

In Malony v. Fortune, 14 Iowa 417, in a case relating to a redemption statute, we said:

"This act provides that 'in all cases when judgments or decrees are rendered by any of the Courts of this State upon a foreclosure of mortgages on real estate, the defendant's judgment creditors and other creditors having liens on the mortgaged premises, shall, in case of the sale of the mortgaged premises, on execution, have the same time to redeem, and the same right of redemption, as in cases of sales on ordinary judgments at law, as provided for in chapter 110, of the Code of 1851, and all acts inconsistent with the provisions of this act are hereby repealed.' * * * When the contract sued on was made, no such right of redemption existed. Section 10 of the Federal Constitution prohibits the passage of any laws by any of the States impairing the obligation of contracts. Article I, section 21, of our State Constitution has a like prohibition against such legislation. *The passage of relief laws*—designed to be retroactive in their operation—in so many of the States, has engaged the attention of not only the State, but also of the Federal Courts, in relation to their constitutionality.

"The argument against the validity of such laws, repeated in so many decisions, is familiar to the legal mind. It is useless, at this time, to undertake to refer in detail to the reported cases in which this question has been so thoroughly discussed. Counsel for appellant raise the question but do not ask us to listen to a suggestion from them in favor of their position. We only add that in *our opinion this act of the Legislature in so far as it affects* contracts made prior to its passage is invalid." (Italics ours.)

In Bronson v. Kinzie, 1 How. 311, 11 L. Ed. 143, the United States Supreme Court, speaking through Chief Justice Taney, said:

"When this contract was made, no statute had been passed by the State changing the rules of law or equity in relation to a contract of this kind. * * * It must, therefore, be governed, and the rights of the parties under it measured by the rules above stated. They were the laws of Illinois at the time; and, therefore, entered into the contract, and formed a part of it, without any express stipulation to that effect in the deed. * * * So, also, the rights of the mortgagee, as known to the laws, required no express stipulation to define or secure them. They were annexed to the contract at the time it was made, and formed a part of it; and *any subsequent law, impairing the rights thus acquired, impairs the obligations which the contract imposed.* (Italics ours.)

"This brings us to examine the statutes of Illinois which have given rise to this controversy. As concerns the law of February 19, 1841, it appears to the court not to act merely on the remedy, but directly upon the contract itself, and to engraft upon it new conditions injurious and unjust to the mortgagee. It declares that, although the mortgaged premises should be sold under the decree of the court of Chancery, yet that the equitable estate of the mortgagor shall not be extinguished, but shall continue for twelve months after the sale; and it moreover gives a new and like estate, which before had no existence, to the judgment creditor, to continue for fifteen months. (The statute provided that if the mortgagor did not redeem in twelve months, creditors could redeem during the succeeding three months.) If such rights may be added to the original contract by subsequent legislation, it would be difficult to say at what point they must stop. An equitable interest in the premises may, in like manner, be conferred upon others; and the right to redeem may be so prolonged, as to deprive the mortgagee of the benefit of his security, by rendering the property unsalable for anything like its value. This law gives to the mortgagor, and to the judgment creditor, an equitable estate in the premises, which neither of them would have been entitled to under the original contract; and these new interests are directly and materially in conflict with those which the mortgagee acquired when the mortgage was made. Any such modification of a contract by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obliagtions, and is prohibited by the Constitution."

In McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397, the Supreme Court of the United States said:

"The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party, and the right acquired by the other. There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law

affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract, in favor of one party, to the injury of the other; hence any law, which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution. This principle is so clearly stated and fully settled in the case of Bronson v. Kinzie, decided at the last term, 1 How. 311 [11 L. Ed. 143], that nothing remains to be added to the reasoning of the court, or requires a reference to any other authority, than what is therein referred to. * * * The obligation of the contract between the parties, in this case, was to perform the promises and undertakings contained therein; the right of the plaintiff was to damages for the breach thereof, to bring suit and obtain a judgment, to take out and prosecute an execution against the defendant till the judgment was satisfied, pursuant to the existing laws of Illinois. These laws giving these rights were as perfectly binding on the defendant, and as much a part of the contract, as if they had been set forth in its stipulations in the very words of the law relating to judgments and executions. If the defendant had made such an agreement as to authorize a sale of his property, which should be levied on by the sheriff, for such price as should be bid for it at a fair public sale on reasonable notice, it would have conferred a right on the plaintiff, which the Constitution made inviolable; and it can make no difference whether such right is conferred by the terms or law of the contract. Any subsequent law which denies, obstructs, or impairs this right, by superadding a condition that there shall be no sale for any sum less than the value of the property levied on, to be ascertained by appraisement, or any other mode of valuation than a public sale, *affects the obligation of the contract, as much in the one case, as the other*, for it can be enforced only by a sale of the defendant's property, *and the prevention of such sale is the denial of a right.*" (Italics ours.)

One of the leading cases of this kind in America is Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042, 41 L. Ed. 93. In that case the court said:

"No provision of the constitution of the United States has received more frequent consideration by this court than that which provides that no state shall pass any law impairing the obligation of

contracts. This very frequency would appear to have rendered it difficult to apply the result of the court's deliberations to new cases differing somewhat in their facts from those previously considered. * * * The decisions of this court are numerous in which it has been held that the laws which prescribe the mode of enforcing a contract, which are in existence when it is made, are so far a part of the contract that no changes in these laws which seriously interfere with that enforcement are valid, because they impair its obligation within the meaning of the constitution of the United States. * * * Without pursuing the subject further, we hold that a statute which authorizes the redemption of property sold upon foreclosure of a mortgage, where no right of redemption previously existed, or which extends the period of redemption beyond the time formerly allowed, cannot constitutionally apply to a sale under a mortgage executed before its passage."

In the case of Smith v. Spillman, 135 Ark. 279, 205 S. W. 107, 110, 1 A. L. R. 136, loc. cit. 142, the court said:

"It is argued that the question of redemption relates merely to the remedy, and a litigant can have no vested right in a mere remedy. Our view of the matter is that a right of redemption does not come within the limits of a mere remedy, but that it affects substantial rights, and where those rights are acquired before the passage of the statute they cannot be disturbed."

A consideration of the foregoing cases can lead to no other conclusion than that, where a right of redemption did not exist before a statute is enacted, or where the right of redemption is extended beyond the time fixed in the redemption statute at the time the mortgage in question was executed, necessarily impairs the obligation of the contract. We can reach no other conclusion. Our court has so held and such is also the universal rule, in both state and federal courts. The Constitution inhibits not only the impairment of the contract, but expressly inhibits the impairment of its obligations. The obligations of a contract include all of the rights of its enforcement existing under the law at the time the contract was executed. We can see no escape from the conclusion that the obligation of the mortgage contract was impaired by the Iowa statute extending the period of redemption.

The rule announced in Malony v. Fortune, 14 Iowa 417, clearly

recognizes the constitutional limitation of the courts. It not only affirms but specifically recognizes the mandate of the Constitution of this state prohibiting the enactment of any laws impairing the obligation of contracts. That decision was rendered during the Civil War, and also affected legislation adopted as a relief measure.

II. Having reached the conclusion that the statute does impair the obligations of the contract in question, can the moratorium statute be upheld notwithstanding the provisions of article XII, section 1, of the Iowa constitution which provides: "This Constitution shall be the supreme law of the State, and any law inconsistent therewith, shall be void." Section 21 of article I provides that no law impairing the obligation of contracts shall *ever* be passed. These provisions of the constitution are plain and unambiguous. The effect of the language used is that *the legislature shall never pass any law impairing the obligation of contracts.*

In order to prevent a possible misunderstanding of these provisions of the Constitution, and secure the integrity thereof, the framers of the Constitution further provided that the Constitution shall be the *supreme law* of the state and that *any other law inconsistent therewith shall be void.* Notwithstanding this provision of the Constitution itself, it is now sought to evade it and sustain the act in question by the so called "police power" of the state. It is claimed that in a period of emergency and financial distress, such as that existing at the present time, the legislature has the right under its reserve powers to enact the statute to enhance the welfare of the state. It is interesting to note, in some of the early decisions by the Supreme Court of the United States, that the very purpose of adopting these provisions was to preserve the integrity of contracts. Nowhere in our Constitution is there any reference to any reserve power in the state government, under which it can adopt legislation in conflict with the provisions of the Constitution. On the contrary, in order to avoid any misinterpretation of the Constitution, the framers thereof inserted therein the specific provision contained in section 21 of article I that any law in conflict with the provisions of the Constitution shall be void. In Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793, 798, the court said:

"The history of the National Constitution throws a strong light upon this subject. Between the close of the War of the Revolution and the adoption of that instrument, unprecedented pecuniary dis-

tress existed throughout the country. 'The discontents and uneasiness, arising in a great measure from the embarrassment in which a great number of individuals were involved, continued to become more extensive. At length, two great parties were formed in every State, which were distinctly marked, and which pursued distinct objects with systematic arrangement.' 5 Marshall, L. of Washington, 85. One party sought to maintain the inviolability of contracts, the other to impair or destroy them. 'The emission of paper money, the delay of legal proceedings, and the suspension of the collection of taxes, were the fruits of the rule of the latter, wherever they were completely dominant.' 5 Marshall, L. of Washington, 86.

" 'The system called justice was, in some of the States, iniquity reduced to elementary principles. * * * In some of the States, creditors were treated as outlaws. Bankrupts were armed with legal authority to be persecutors and, by the shock of all confidence, society was shaken to its foundations.' Fisher Ames' Works, Ed. of 1809, 120. 'Evidences of acknowledged claims on the public would not command in the market more than one fifth of their nominal value. The bonds of solvent men, payable at no very distant day, could not be negotiated but at a discount of thirty, forty or fifty per cent per annum. Landed property would rarely command any price; and sales of the most common articles for ready money could only be made at enormous and ruinous depreciation.'

" 'State Legislatures, in too many instances, yielded to the necessities of their constituents, and passed laws by which creditors were compelled to wait for the payment of their just demands, on the tender of security, or to take property at a valuation, or paper money falsely purporting to be the representative of specie.' Ramsey, Hist. U. S., 77.

" 'The effects of these laws interfering between debtors and creditors were extensive. They destroyed public credit and confidence between man and man, injured the morals of the people, and in many instances insured and aggravated the ruin of the unfortunate debtors for whose temporary relief they were brought forward.' 2 Ramsey, Hist. S. C., 429.

"Besides the large issues of continental money, nearly all the States issued their own bills of credit. In many instances the amount was very large. 2 Phillips' Hist. Sketches of Am. Paper Currency, 29. The depreciation of both became enormous. Only one per cent of the 'continental money' was assumed by the new government.

Nothing more was ever paid upon it. Act of August 4, 1790, section 4, 1 Stat. at L. 140. 2 Phillips' Hist. American Paper Currency 194. It is needless to trace the history of the emissions by the States.

"The Treaty of Peace with Great Britain declared that 'The creditors on either side shall meet with no lawful impediment to the recovery of the full amount in sterling money of all bona fide debts heretofore contracted.' The British Minister complained earnestly to the American Secretary of State, of violations of this guaranty. *Twenty-two instances of laws in conflict with it in different States were specifically named.* 1 Am. St. Papers, pp. 195, 196, 199, and 237. In South Carolina, 'laws were passed in which property of every kind was made a legal tender in payment of debts, although payable according to contract in gold and silver. Other laws installed the debt, so that of sums already due, only a third and afterwards only a fifth, was securable in law.' 2 Ramsey, Hist. S. C., 429. Many other States passed laws of similar character. The obligation of the contract was as often invaded after judgment as before. The attacks were quite as common and effective in one way as in the other. *To meet these evils in their various phases, the National Constitution* declared that 'No State should emit bills of credit, make anything but gold and silver coin a legal tender in payment of debts, *or pass any law \* \* \* impairing the obligation of contracts.*' (Italics ours.) All these provisions grew out of previous abuses. 2 Curt. Hist. of the Const. 366. See, also, the Federalist, Nos. 7 and 44. In the number last mentioned, Mr. Madison said that such laws were not only forbidden by the Constitution, but were 'contrary to the first principles of the social compact, and to every principle of sound legislation.'

"The treatment of the malady was severe, but the cure was complete.

" 'No sooner did the new government begin its auspicious course than order seemed to arise out of confusion. Commerce and industry awoke, and were cheerful at their labors, for credit and confidence awoke with them. Everywhere was the appearance of prosperity, and the only fear was that its progress was too rapid to consist with the purity and simplicity of ancient manners.' Fisher Ames' Works, supra, 122.

" 'Public credit was reanimated. The owners of property and holders of money freely parted with both, well knowing that no

future law could impair the obligation of the contract.' 2 Ramsey, Hist. S. C. 433.

"Chief Justice Taney, in Bronson v. Kinzie, supra, speaking of the protection of the remedy, said: 'It is this protection which the clause of the Constitution now in· question mainly intended to secure.' * * *

"We think the views we have expressed carry out the intent of contracts and the intent of the Constitution. The obligation of the former is placed under the safeguard of the latter. No State can invade it; and Congress is incompetent to authorize such invasion. Its position is impregnable, and will be so while the organic law of the nation remains as it is. The trust touching the subject with which this court is charged is one of magnitude and delicacy. We must always be careful to see that there is neither non-feasance nor misfeasance on our part.

"The importance of the point involved in this controversy induces us to restate succinctly the conclusions at which we have arrived, and which will be the ground of our judgment. The remedy subsisting in a State when and where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the State which so affects that remedy as substantially to impair and lessen the value of the contract is forbidden by the Constitution, and, is, therefore, void."

In Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, loc. cit. 295 and 296, the Supreme Court of the United States said, in reference to the men framing the Constitution:

"Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any

of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism.".

In Scott v. Sandford, 19 How. 393, 15 L. Ed. 691, loc. cit. 710, the court, speaking through Chief Justice Taney, said:

"As long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day."

In South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, the court, speaking through Justice Brewer, said:

"The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now. * * * Those things which are within its grants of power, as those grants were understood when made, are still within them; and those things not within them remain still excluded."

It is claimed that the statute under consideration is valid because it was enacted under the "police powers" of the state. In State v. Packing Co., 124 Iowa 323, loc. cit. 330, 100 N. W. 59, 61, we said:

"The police power is very broad, and so elastic that no comprehensive definition has ever been attempted. Of necessity, this must be so, for it must ever respond to such social conditions 'as an advancing civilization of a highly complex character requires.' Anything which legitimately tends to promote public morals, health, or security is within its scope; and courts should not too closely scrutinize legislative acts, bottomed on this power. Primarily, it is for that department of government to determine what acts are or may be productive of fraud or deceit, and what inhibitions will best secure the public health and safety. But the question is not wholly legislative in character. Such acts are subject to review by the court, *and the securities guaranteed by the Constitution must be preserved.* Yet in all such controversies there is a broad presumption in favor of the exercise of the power, *and courts* should only

interfere when the acts are palpably in contravention of some constitutional provision." (Italics ours.)

In State v. Schlenker, 112 Iowa 642, loc. cit. 646, 84 N. W. 698, 699, 51 L. R. A. 347, 84 Am. St. Rep. 360, we said:

"Ordinarily the legislature determines when the public welfare and safety demand its exercise; and, as a general rule, courts have nothing to do with the policy, wisdom, or necessity of the enactment. Of course, the state cannot, by arbitrarily assuming that a commodity is injurious to the health or comfort of the people, impair individual rights guaranteed by the Constitution. *The police power of the state,* like every other, *is subject to the constitution, and cannot be used as a cloak* under which to disregard constitutional rights or restrictions. \* \* \* Courts will not interfere, as a rule, unless there is a plain excess or usurpation of power, and in case of doubt it should be solved in favor of the power of the legislature to make the enactment." Hannibal & St. J. Railroad Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527. (Italics ours.)

"*However broad* the scope of the *police power, it is always subject to the rule that the legislature may not exercise any power that is expressly or impliedly forbidden to it by the State Constitution.*" 12 C. J. 929. (Italics ours.)

Innumerable cases may be cited showing that the police power of the state is subordinate to the expressed provisions of the Constitution of the state. Where the Constitution specifically declares certain laws to be void if they are contrary to and inconsistent with the provisions of the Constitution, then such legislation is unconstitutional and void.

The provisions of the Iowa Constitution prohibiting legislation impairing the obligation of contracts are so clear and unambiguous that "he who runs may read". These provisions are so clear and unambiguous that judicial construction is hardly necessary to determine their meaning. They are so clear that "he who runs" may also understand their meaning. It would seem repugnant, to both the Constitution and reason, to hold a statute valid which impairs the obligations of a contract, notwithstanding an express constitutional provision *that it shall be invalid,* and "that any law inconsistent with the Constitution shall be void."

Certain well-known rights are guaranteed to the people of this

state by the Constitution. One of the most important of these is that prohibiting legislation against an impairment of the obligation of contracts. If such legislation be held valid in the face of the constitutional guaranty against the impairment of a contract, then all other rights guaranteed to the people in the bill of rights under the Constitution are in serious jeopardy. The courts are the only protection against an infringement upon these rights by the legislature. If the legislature attempts to encroach upon the clear constitutional rights of the people, the duty of the courts is clear. The people can resort to no other tribunal. The court constitutes the only bulwark against a violation of these rights.

There is no provision in our Constitution suspending the provisions against the impairment of the obligations of a contract. If the people of this state desire to change their Constitution, they can do so in the manner pointed out in the Constitution itself. It cannot be done through the courts or through the legislature, under the present Constitution. If the legislation in question is imperative and necessary, authority therefor must first be obtained by repealing the constitutional guaranty against impairing the obligations of a contract. We think the court is powerless to authorize legislation to that effect.

The mortgage redemption statute unquestionably impairs the obligations of the mortgage contract. It is repugnant to and inconsistent with the provisions of our state constitution relating thereto.

It is claimed by appellee that the special economic emergency existing at this time is sufficient to justify the Iowa statute in question, under the "police power" of the state.

We recognize the existence of an emergency and believe the statute was adopted for the most laudable purposes. However laudable the purpose of a statute may be, or whatever the intention of the legislature may be in adopting it, it is always subject to the limitations contained in the Constitution. If the legislature, because of an emergency under its "police power", can enact laws inconsistent with provisions of the Constitution, then the supreme law of the state would not be the Constitution, and the expressed will of the sovereign power of the state could be thwarted. The sovereign power of the state is vested in the people, and their will, as expressed in the Constitution, is supreme. The people in their sovereign capacity have expressed the fundamental laws of this state, by and through the Constitution.

The Constitution contains no provisions under which the prohibition against impairing the obligation of contracts can be suspended or overruled. It contains provisions for repealing any of its provisions, but the inhibition against impairing the obligation of contracts has never yet been repealed or suspended.

As hereinabove set out, the decisions of both federal and state courts in America are practically unanimous in holding that a statute extending the period of redemption beyond that contained in the mortgage, or one granting a period of redemption from the foreclosure of a mortgage, which does not provide therefor, impairs the obligation of a contract.

The police power of a state cannot, by any rule of reason, be held to be superior to the provisions of the Constitution itself. The sovereign will of the people as expressed in the Constitution declares that instrument to be the supreme law of the state. All other powers including the police power are limited thereby. It necessarily follows that the courts are powerless to say that some other law is higher than the "supreme law" as announced in the Constitution itself.

The persuasive use of the langauge, in such a manner as to apparently permit or justify a violation of the plain and unambiguous provisions of the Constitution, would eventually result in a destruction of all other vital rights which the Constitution attempts to safeguard in the people, and would finally end in a disintegration of the structure itself. Is the statute in question valid? Our own Constitution answers that question when it says: "No law which impairs the obligations of a contract, shall ever be passed"; and *"This Constitution shall be the Supreme Law of the State, and any law inconsistent therewith shall be void."*

In my opinion the law is inconsistent with the Iowa Constitution and is therefore void. The judgment of the lower court should be reversed.